**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VERTIME B.V., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| NEW DOVER GROUP, LTD., | : |
| | : |
| Defendant. | : |

CIVIL ACTION NO. 7:17-cv-03844(KMK)

**POST-BANKRUPTCY RENEWED**
**MOTION FOR CONTEMPT, SANCTIONS, AND TO APPOINT RECEIVER**

Pursuant to the Court's August 3, 2022 Order, Plaintiff, Vertime B.V. ("Vertime"), respectfully submits this Post-Bankruptcy Renewed Motion for Contempt, Sanctions, and to Appoint a Receiver against Defendant New Dover Group, Ltd. (hereafter "NDG") and against third-parties Chaim Fischer, Stuhrling Original, LLC, and Stuhrling Outlet (collectively "Fischer-Stuhrling").

{W3422479}

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................ 1

II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY ..................................... 3

    A.     NDG concealed the Move and falsely represented (1) that it still had the Products and (2) that an injunction would destroy its cash flow. ........................................................ 3

    B.     Contrary to NDG's representations, Vertime discovered that Fischer-Stuhrling was selling the Products. ........................................................................................................ 5

    C.     NDG/Friedman and Fischer-Stuhrling never agreed on the terms of the purported "sale." .......................................................................................................................... 6

    D.     The arrangement with Fischer-Stuhrling was not a good-faith, arm's-length transaction. .......................................................................................................................... 7

    E.     NDG and Fischer-Stuhrling (falsely) claimed that the three invoices are proof that the Move occurred on June 13 and 14, 2017. ...................................................................... 8

    F.     Friedmann unabashedly admitted that he tried to hide the Move from the Court and Vertime. ................................................................................................................ 11

    G.     At the Hearing, NDG continued to base its defense on the claim that the invoices showed that the Move occurred on June 13 and 14, 2017. ........................................... 12

    H.     Evidence produced after the Hearing proved the basis of NDG's and Fischer-Stuhrling's defense to be false. ..................................................................................... 13

    I.     NDG destroyed or has wrongfully withheld evidence. .................................................. 14

    J.     Fischer knew about the Injunction, at the latest, in January 2018 and ignored it. ........ 15

III.   LEGAL STANDARD ................................................................................................. 15

IV.    ARGUMENT ............................................................................................................ 17

    A.     NDG AND FISCHER-STUHRLING SHOULD BE HELD IN CONTEMPT FOR VIOLATING THE INJUNCTION. .................................................................................. 17

        1.     NDG has been in contempt since the Injunction issued. .............................. 17

        2.     Fischer-Stuhrling has been in contempt since, at least, January 2018. ......... 18

B.  APPOINTMENT OF A RECEIVER IS THE ONLY REASONABLE WAY TO ENSURE COMPLIANCE WITH THE INJUNCTION. ................................................ 19

C.  NDG AND FISCHER-STUHRLING SHOULD BE SANCTIONED FOR THEIR VIOLATION OF THE INJUNCTION. .......................................................................... 21

D.  NDG SHOULD BE SANCTIONED FOR ITS FALSE AND MISLEADING STATEMENTS. .......................................................................................................... 22

E.  FISCHER-STUHRLING SHOULD BE SANCTIONED FOR ITS FALSE AND MISLEADING STATEMENTS CONCERNING THE DATE OF THE MOVE. ........ 25

V.  CONCLUSION .............................................................................................................. 25

## I.    INTRODUCTION

On June 15, 2017, the Court granted Vertime's Motion for a Preliminary Injunction [D.N. 34], and on June 23, 2017, the Court entered the parties' Order on Consent for Preliminary Injunction [D.N. 36] (collectively, the "Injunction").  The Injunction is clear and unambiguous: "NDG, and all persons acting in active concert or participation with it, shall not offer to sell, accept any offer to sell, or enter into the sale of any part or all of the remaining stock of [Salvatore Ferragamo, Versace, and/or Versus timepieces (the "Products")].

On August 14, 2018, Vertime filed its initial Motion for Contempt, Sanctions and to Appoint Receiver (the "First Motion").  [D.N. 112.00.]  NDG and Fischer-Stuhrling based their defenses to the First Motion on an assertion that NDG "sold" its entire stock of Products to Fischer-Stuhrling and that those "sales" were complete on June 13 and 14, 2017: *during the preliminary injunction hearing*.  (NDG's transport of the Products to Fischer-Stuhrling is hereinafter referred to as the "Move.")  For various reasons, not the least of which is the fact that the only documents concerning the Move were created on or after August 2, 2017, the claim that the Move occurred on June 13 and 14, 2017 appeared dubious at best (if not outright false).  Therefore, on January 28, 2019, the Court ordered an evidentiary hearing.

The hearing on the First Motion was held on March 5, 2019 (the "Hearing").  At the Hearing, Friedmann and Fischer revealed that they are brothers-in-law: Friedmann is married to Fischer's sister.  Friedmann continued to claim that the Move occurred on June 13 and 14, 2017.  Fischer claimed that he didn't know when it occurred.  Following the hearing, NDG produced the smoking gun: the QuickBooks Audit Trails for the invoices on which NDG and Fischer-Stuhrling based their defense.  Consistent with all other documentation, these Audit Trails show that the invoices on which NDG and Fischer-Stuhrling relied did not exist until August 2, 2019.

Indeed, all of the evidence, including Friedmann's testimony that he was in Europe when the Move occurred, shows that the Move occur *after* the Injunction entered.  It is undisputed that all of Fischer-Stuhrling's sales occurred after the Injunction.

On March 29, 2019, the Court denied the First Motion without prejudice [D.N. 153] to create a "time out" to determine whether any additional discovery was necessary and to allow for re-briefing of the motion, considering the lengthy and disjointed procedural history caused by NDG's and Fischer-Stuhrling's discovery non-compliance.  On June 10, 2019, Vertime filed a Renewed Motion for Contempt, Sanctions, and to Appoint Receiver. [D.N. 160.] On July 8, 2019, New Dover filed a petition for bankruptcy. [D.N. 184, Decl. of Todd R. Michaelis ¶¶ 13, Ex. P-11.] On July 11, 2019, the Court stayed this case pending New Dover's bankruptcy. [D.N. 164.] Following the conclusion of New Dover's bankruptcy, the Court entered a new briefing schedule directing Vertime to re-file its Motion. [D.N. 182.]

With regard to this Motion, Vertime understands Fischer-Stuhrling's document production to be complete, and NDG has been afforded numerous opportunities to comply with its document production obligations over a period of approximately fifteen months prior to the bankruptcy and has repeatedly represented that all extant responsive documents have been produced.  NDG's and Fischer-Stuhrling's key witnesses testified at the Hearing, and presumably NDG will stand behind the authenticity of the documents it produced after the Hearing.  Therefore, no further discovery should be necessary prior to adjudication of Vertime's contempt motion and Vertime hereby re-files/renews that motion.

Vertime seeks (1) a finding of contempt and an award of sanctions against NDG and Fischer-Stuhrling for their violations of the Injunction; (2) a finding of contempt and an award of sanctions against NDG for the false statements made by its witnesses; (3) a finding of contempt

and an award of sanctions against Fischer-Stuhrling for its false statements concerning the date of the Move; and (4) appointment of a receiver to ensure compliance with the Injunction by removing the Products from NDG's and Fischer-Stuhrling's possession.[1]

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Injunction was granted on June 15, 2017, at the close of oral argument, and was docketed on June 23, 2017 with the Order on Consent for Preliminary Injunction.  The Injunction proscribes NDG and all persons in active concert or participation with it from selling the Products.[2]  [D.N. 36.]  For months after the Injunction entered, Vertime was under the impression that NDG was compliant, because NDG consistently represented that it was complying with the Injunction.

### A.    NDG concealed the Move and falsely represented (1) that it still had the Products and (2) that an injunction would destroy its cash flow.

On June 5, 2017, Judit Freidmann, "the founder of New Dover," declared, under penalty of perjury: "If the court orders the relief sought by Vertime, our ability to sell off the merchandise . . . will be destroyed. . . . We will have to pay for storing and maintaining the merchandise even as our cash flow would be reduced to a trickle."  [D.N. 23 ¶¶ 2, 24.]  Yiddy Werzberger, NDG's Acting C.O.O., declared, under penalty of perjury: "[A]ny order . . . requiring New Dover to tie up its inventory until this case is resolved would . . . choke New Dover's cash flow to a trickle . . . ."  [D.N. 24 ¶ 60.]  He further declared that "New Dover has identified a bona fide potential buyer that will purchase all of New Dover's stock at a fair price"

---

[1] Pursuant to the Court's direction, Vertime does not address the quantum of its damages in this Motion, but will do so after the Court rules on this Motion.

[2] The Injunction is conditional in that if NDG were to meet certain requirements it would have certain rights to sell the Products.  The conditional nature of the Injunction is not at issue here, however, because it is undisputed that NDG has not met any of the Injunction's conditions.  Presently, the Injunction prevents all sales of the Products.

*if the sale were to be "allow[ed]."*[3]  [Id. ¶ 63 (emphasis added).]  On June 13, 2017, at the

injunction hearing, Werzberger claimed that as of that date NDG had "more than $15 million in

stock." (Ex. P-5[4]: June 13, 2017 Tr. at 162:25.)  When asked what effect the Injunction would

have on NDG's business, Mr. Werzberger testified: "Being that at the time of the expiration

Vertime business was about 85 percent of our business, it would really put a humongous damper

on our business.  It will probably bring our cash flow to a trickle."  (June 13, 2017 Tr. at 183:21-

24.)

Oral argument on Vertime's motion for a preliminary injunction was held on June 15,

2017.  NDG (through counsel) represented that, although it could potentially sell the Products to

a buyer at a significant discount (Ex. P-6: June 15, 2017 Tr. at 263:9-18), it had not sold the

Products:

> One thing that hasn't changed is that, although our client has
> acknowledged that it has sold merchandise, the threat that has been
> described by . . . Vertime that [NDG] will mercilessly dump this
> merchandise on the market has not happened and there have been no
> restrains in place.  Why has it not happened?  Well, first of all, my client
> has informed me because it has respect for this process. . . .  The other
> reason it hasn't happened is because it's not in the interest of New Dover
> to do that, as Mr. Werzberger testified.  **It has the stock on-hand**.

(June 15, 2017 Tr. at 269:9-19 (emphasis added).)

NDG further represented that if the Injunction was granted, it would put NDG out of

business because NDG would have no cash flow from the sale of the Products:

> If the injunction is granted, New Dover will not stay in business.  If the
> injunction is not granted, New Dover will have – by virtue of being able to

---

[3] This potential buyer was ***not*** NDG; it was "E.N.E."  (Hr. Tr. at 196:22-25.)

[4] Exhibits that were not marked at the Hearing are attached to the Declaration of Todd R. Michaelis filed herewith.

> sell its inventory, will have cash flow[5] that will enable it to make the
> investment necessary . . . to replace the lost business of Vertime.

(June 15, 2017 Tr. at 291:17-24.)

Several months later, on October 26, 2017, NDG continued to represent to the Court that

NDG still had the products and was compliant with the Injunction: "New Dover . . . essentially

shuttered its business as a result of the preliminary injunction, remains bound by its terms and

unable to sell a substantial stock of rapidly depreciating merchandise." [D.N. 58 at 4.]

**B.      Contrary to NDG's representations, Vertime discovered that Fischer-Stuhrling was selling the Products.**

In late 2017, Vertime noticed that unauthorized sales of Products were occurring, at least,

on an Amazon.com storefront called EvergreenCreations. Vertime determined that Samuel

Schiff was associated with this Amazon.com storefront and subpoenaed him for a deposition. By

February 2, 2018, Mr. Schiff had contacted Friedmann. (Hr. Ex. N.) Friedmann said that "he

call me up panicking, 'What's that?' And I said, 'Let me call, call my lawyer.'" (Ex. P-10: Hr.

Tr. at 97:14-15.) Friedmann then sent an e-mail to his lawyer asking whether Schiff can

"ignore" Vertime's subpoena. (Mar. 5, 2019 Hr. Ex. N.)

On or about February 5, 2018, Schiff contacted Vertime's counsel to request additional

time to respond so that he could obtain counsel to assist him in his response. [D.N. 82, Decl. of

Todd R. Michaelis ¶¶ 3-4.] Ultimately, even after obtaining counsel, Schiff did ignore the

subpoenas, which Vertime had to re-serve. [Id. ¶¶ 8-10.] Brazenly, Schiff also ignored those

subpoenas. [Id. ¶ 11.] Indeed, Schiff only appeared for his deposition after his untimely motion

to quash the subpoenas was denied by Magistrate Judge McCarthy. On May 15, 2018, Vertime

---

[5] NDG conceded that the supposedly *potential* discounted sale may not actually be a loss to NDG: "Your Honor, we'll conceded that we might not be taking a bath. It might be a much better deal than it appears to be." (See June 15, 2017 Hearing Transcript at 298-99.)

deposed Schiff and learned that he worked for Fischer-Stuhrling, which had possession of and was selling the Products.[6]

### C.    NDG/Friedman and Fischer-Stuhrling never agreed on the terms of the purported "sale."

On June 26, 2018, Vertime deposed Chaim Fischer, who testified on behalf of himself, Stuhrling Outlet, LLC, and Stuhrling Original (LLC). During the deposition, Fischer-Stuhrling described the terms of its deal with Friedmann/NDG:

> I made it clear to him that I can take the goods, I can buy the goods, but it's going to have to be at my terms an it's going to have to be at a very, very significant discount. I could only pay him as I sell it. And if he agrees to that, then he can decide to execute the transaction. He wasn't happy. He pushed and asked me to actually, you know, buy it and pay at his terms. But I didn't agree. And the last I know, it was sometime in June, he said, all right, I guess you win.
> . . . .
> **So, I just said when you're ready, if you're okay with my terms, deliver the goods and I'll try to sell it.** That was the . . . length of the discussions we've had. It was fairly easy and very noncommittal on my part.

(Ex. P-8: June 26, 2018 Tr. at 33:3-24 (emphasis added).) It is clear that Fischer believed he had no obligation to pay unless and until he sold watches because when asked whether he "confronted Friedmann about the fact that there was a court order that Friedmann didn't tell him about," Fischer testified: "No. I have absolutely nothing to lose. The deal was structured in a way where it really didn't affect me, other than my reputation." (June 26, 2018 Tr. at 132:22 – 133:4.)

Friedmann, on the other hand, testified that the deal had one-year payment terms:

> Q. And Stuhrling agreed to pay New Dover / First SBF only when the watches were sold by Stuhrling, right?

---

[6] Schiff was an employee of Fischer-Stuhrling until the end of 2018. (Mar. 5. 2019 Tr. at 164:22-25 – 165:1-3.) Fischer-Stuhrling told Schiff to reach out to NDG if he needed any advice or guidance in selling the watches. (Ex. P-7: May 15, 2018 Tr. at 57-59.)

A. No.

Q. Oh, that's not true.  What were the payment terms that Stuhrling agreed to?

A. It was one year, one year terms, and if he sells it before, he's gonna pay me before.

(Hr. Tr. at 77:6-12; 128:10-14 ("It was 12 months, and if he's gonna sell it before, he's gonna pay me before.").)[7]

Fischer confirmed at the Hearing, however, that he did not agree to pay within one year:

Q. Did you ever agree with Mr. Friedmann that you would pay him for the 50,000 or so watches within one year of the purchase?

A. He had requested that.  He had asked for that numerous times that I commit to it.

Q. Did you ever agree to that?

A. I tried not to.

(Hr. Tr. at 173:22-174:3.)

**D.    The arrangement with Fischer-Stuhrling was not a good-faith, arm's-length transaction.**

The arrangement between NDG and Fischer-Stuhrling was not a good-faith arm's-length transaction.  First, Friedmann and Fischer are family.  Friedmann is married to Fischer's sister, making them brothers-in-law.[8]  (Hr. Tr. at 39:19-23.)

Second, there was nothing ordinary about this arrangement.  Indeed, Friedmann spontaneously testified as follows: "Because I knew that, that an injunction coming, I needed to sell it, for a major loss.  So, basically, I was broke."  (Hr. Tr. at 109:8-9.)  He also testified that Fischer-Stuhrling didn't have any interest in the timing of the Move: "He didn't care.  He didn't,

---

[7] Demonstrating the falsity of Mr. Friedmann's testimony, in its bankruptcy petition, New Dover did not report as an asset any receivable due from Fischer-Stuhrling. [*See* D.N. 184, Decl. of Todd R. Michaelis ¶¶ 13, Ex. P-11 at Schedules A/B.]

[8] Friedmann tried to avoid this fact at the Hearing, and incredulously claimed that he forgot how to spell his Wife's maiden name.  (Hr. Tr. at 39:8-15.)

he didn't even know that I deliver - - he didn't, he didn't care when I'm gonna deliver what, where."  (Hr. Tr. at 146:11-13.)

Fischer corroborated Friedmann's claim that Fischer didn't care when he claimed to not know any material facts concerning the Move.  He claimed he did not know (or care): (1) the date on which the Products were delivered to his warehouse (Hr. Tr. at 156 at 19-22); (2) why Friedmann was willing to "sell" him 50,000 or so watches at a steep discount (Hr. Tr. at 161:5-9); (3) when the invoices were first transmitted to him or one of his companies (Hr. Tr. at 162:23-25); (4) who the first person at Fischer-Stuhrling was to receive anyone of the three invoices (Hr. Tr. at 163:1-4); and (5) whether there were any records of Fischer-Stuhrling's sales of Products (Hr. Tr. at 172:5-9).  In short, he claimed to know nothing about the implementation of this purported multi-million-dollar arrangement with his brother-in-law.  (See id.)  His justification for knowing nothing was: "I'm not evading anything.  I'm not really sure of the dates or how this whole thing has transpired, because it's not really my department.  So I'm not sure."  (Hr. Tr. at 163:25-164:3.)

Finally, despite the fact that he was the acting C.O.O. of NDG and NDG's witness at the Hearing, NDG made sure that Werzberger had no involvement with the Stuhrling transaction (Hr. Tr. at 195:22-196:12) and Friedmann intentionally kept him in the dark about it (Hr. Tr. at 148:5-151:5.)

    **E.**    **NDG and Fischer-Stuhrling (falsely) claimed that the three invoices are proof that the Move occurred on June 13 and 14, 2017.**

In connection with its deposition, Fischer-Stuhrling produced the invoices marked at the Contempt Hearing as Exhibits F, G, and H.[9]  Having confirmed that the sale of Products was

---

[9] Fischer claimed that Hearing Exhibit F was received on "[t]he date it was marked," or at least he assumed so based on the date on the document because that is usually how it is done.  (June 26, 2018 Tr. at 53:5-14.)  He also testified,

ongoing, on June 29, 2018, Vertime filed a pre-motion conference request with regard to its intent to file a motion for contempt.  [D.N. 102.]

NDG's opposition to Vertime's request was premised upon a claim that the "invoices all indisputably reflect dates of sale prior to the entry of the preliminary injunction."  [D.N. 105 at 1.]  NDG also claimed that the "sales were between two unrelated, separate, entities, and were completed transactions as of the dates of the invoices."  [Id.]  Fischer-Stuhrling's opposition to Vertime's request was similarly premised upon a claim that the "purchases" "occurred on June 13 and 14, 2017, *as evidenced by the invoices*."  [D.N. 103 at 2 (emphasis added).]

On July 24, 2018, the Court held a pre-motion conference.  Thereafter, the parties submitted a proposed revised injunction [D.N. 110] that expressly applied to Fischer-Stuhrling, which was entered by the Court on August 13, 2018.  [D.N. 111.]  On August 14, 2018, Vertime filed its Motion for Contempt, Sanctions, and to Appoint Receiver (the "First Motion").  [D.N. 112.]

In opposition to the First Motion, NDG claimed that "[i]n June 2017, three separate sales of inventory to Stuhrling were completed and delivered to Stuhrling on the dates appearing on the invoices, June 13, 2017 and June 14, 2017."  [D.N. 122 at 2; D.N. 123 ¶¶ 4-5.]  It further claimed that the sales "were a product of a period of good-faith, arm-length negotiations between NDG and Stuhrling . . . ."  [Id.]  NDG further claimed that the "sales to Stuhrling were final sales at the time of delivery, with Stuhrling having no right to return the products purchased, and with dates for full payment, appearing the box titled 'Terms' on each invoice."  [D.N. 122 at 2; D.N. 123 ¶ 6.]

---

however, that Mel Moskowitz asked for an electronic copy *a few days later*.  (June 26, 2018 Tr. at 53:19-24 (emphasis added).)  This is significant because the electronic copies of the invoices marked as Hearing Exhibits F, G, and H were not sent to Mel Moskowitz until August 2, 2018.  (Hr. Ex. J.)  Nor could they have been as they did not exist until August 2, 2018.  (See Ex. P-1; QuickBooks Audit Trails produced by NDG on March 19, 2019; see also D.N. 152 ¶ 1.)

Fischer claimed "[w]e purchased the watches prior to the actual order enjoining their sale . . . ." [D.N. 121 ¶ 3.] Fischer-Stuhrling argued that "all of the transfers of product to Stuhrling were completed by June 14, 2017, the day before the injunction hearing was concluded. [D.N. 119 at 4.] In support of this assertion, Fischer-Stuhrling cited pages 57 to 58 of its deposition testimony. [Id.]

Fischer's actual testimony with regard to the date on which it received the Products was inconsistent with Fischer-Stuhrling's claim concerning the date of the "sale." He testified that he did not recall when the watches were delivered. (June 26, 2018 Tr. at 56:18-22.) The testimony on which Fischer-Stuhrling relied for its claim that the "transfers of product to Stuhrling were completed by June 14, 2017" were Fischer's baseless (speculative) claims that Fischer-Stuhrling received the invoices (Hearing Exs. F-H) on the dates on the invoices:

> Q: So, it's your testimony that your company received [Exhibit G] on June 14 of 2017, the date of the invoice?
> A: I would assume so.
> Q: All right. Then is it also your testimony that your company received [Exhibit F], the invoice dated June 13th of 2017 on that date, sir?
> A: Correct.
> . . . .
> Q: And what is the date on [Exhibit H]?
> A: The same as [Exhibit G], 6/14.
> Q: June 14th. And is it your testimony, sir, that your company first received [Exhibit H] on the date of the invoice, June 14th of 2017?
> A: Correct.

(June 26, 2018 Tr. at 57:21 – 58:25.) Fischer's testimony was also inconsistent with NDG's claim of "three separate sales"[10]; he testified that "this was - - when I say 'package,' it was sold *as one package.* How Mr. Friedman divided it, I have no idea." (June 26, 2018 Tr. at 56:6-8 (emphasis added).)

---

[10] Friedmann's Hearing testimony was also inconsistent with the claim of "three separate sales": "I sold it in one package. It's not, it's not about Exhibit F or - - this was not three different deals. It was one deal." (Hr. Tr. at 57:9-11.)

On November 19, 2018, after briefing of the First Motion was complete, Fischer-Stuhrling disclosed its sales and payment data concerning the Products. (Hr. Exs. S (sales data) and I (payment data).) Fischer-Stuhrling sold $1,454,775.27 of Products and remitted $745,800.00 of those sales to NDG. (Hr. Exs. S & I.) Fischer-Stuhrling's sales were made between September 14, 2017 and July 24, 2018. (Hr. Ex. S.) After its payments to NDG, Fischer-Stuhrling netted $708,975.27. (See Hr. Exs. S & I.)

Based on this information, on December 12, 2018, Vertime filed a letter to supplement to its First Motion to notify the court of these newly discovered facts. [D.N. 141.] Fischer-Stuhrling responded to Vertime's supplement on December 17, 2018. [D.N. 142.] In that response, Fischer-Stuhrling claimed: "The claim that Fischer failed to produce the invoices from earlier than August 2017 is incorrect. Fischer produced the invoices that were received with the deliveries on June 13 and 14, 2017." [D.N. 142 at 2.] NDG also reiterated that the basis of its defense of the First Motion was that the "sale" occurred before June 15, 2018. [D.N. 145.]

On December 19, 2018, the Court scheduled oral argument of the First Motion for January 28, 2019. On January 28, 2019, the Court explained that due to patent credibility issues the Court would hold an evidentiary hearing, and Friedmann, Fischer, and Werzberger would need to testify under oath. (Ex. P-9: Jan. 28, 2019 Tr. at 24-28.) The Court scheduled that hearing for February 12, 2019. (Jan. 28, 2019 Tr. at 31.) Due to inclement weather, that hearing was postponed until March 5, 2019. (See D.N. 146.)

**F.      Friedmann unabashedly admitted that he tried to hide the Move from the Court and Vertime.**

At the Hearing, Friedmann admitted that he tried to conceal the Move from the Court:

> Q. Isn't it true that you did not want your lawyer to know that you had sold off almost all of New Dover's inventory of Vertime products?
> A. Yes.

> Q. And you didn't want your lawyer to know, Mr. Friedmann, because you knew that your lawyer would have to inform the Court that the inventory was gone, right?
> A. I didn't see - - I didn't see any benefit.

(Hr. Tr. at 50:1-12; see also; Hr. Tr. at 52:16-19 (Friedmann admits that he did not want the Court to find out about the Move).) Friedmann also claimed that he intentionally kept NDG's witness (Yiddy Werzberger) and counsel in the dark [D.N. 123 ¶ 5] and claimed that he waited until just after Werzberger testified to inform him of the supposed deal with Fischer-Stuhrling (Hr. Tr. at 45:12-20).[11]

### G.    At the Hearing, NDG continued to base its defense on the claim that the invoices showed that the Move occurred on June 13 and 14, 2017.

Friedman claimed that he made a handshake deal with Fischer at a wedding on June 11, 2017.  (Hr. Tr. at 140:5-7.)  He also claimed that, at the earliest on June 12, 2017, he told the "shipping department" to get the Products out "right away, as soon as possible."  (Hr. Tr. at 56:2-25.)  He claimed that the invoices were completed on June 20 (Hr. Tr. at 69:17-19), which was suspect even at the time of the hearing.  (See Tr. Hr. at 147:1-148:4.)  Friedmann also (incredibly) claimed that he (impossibly) hand-delivered the invoices to Stuhrling in June 2017. (Hr. Tr. at 131:22-132:19.)

---

[11]It is important to note, however, that Werzberger's March 5, 2019 testimony concerning his discussion with Friedmann after Werzberger's June 13, 2017 testimony does not coincide with Friedmann's claim.  Werzberger testified that he did not see Friedman on June 13, 2017.  (Hr. Tr. at 195:16-17.)  He said that he spoke to him via telephone:

> When I finished testifying here, I was told – I called Mr. Friedmann to tell - - to let him know that we were done here, and I did tell him that I think the Judge had not ruled yet and that if he has an opportunity, he should try to sell it, and he asked me "Am I allowed to?" And I said, "I'll double-check with the attorney" at the time. . . .  And, so, then I called him back, and I'm not gonna say what was discussed, but – and, then when I called him back at a later time, he told me I shouldn't worry about it.

(Hr. Tr. at 193:12-24.)  He did not corroborate Friedmann's claim that he told him that he already sold everything to Fischer-Stuhrling.

**H.     Evidence produced after the Hearing proved the basis of NDG's and Fischer-Stuhrling's defense to be false.**

NDG's and Fischer-Stuhrling's defenses are premised on a lie: the invoices they base their defenses on were not created until August 2, 2017.  (Ex. P-1.)  NDG's QuickBooks Audit Trails for the invoices show that these invoices did not exist until August 2, 2018 (see Ex. P-1;), which is the date on which NDG sent these invoices to Stuhrling-Fischer.[12] [13]  (Hearing Ex. J (e-mail messages from NDG to Fischer-Stuhrling); Hr. Tr. at 82-86.)  Indeed, neither NDG nor Fischer-Stuhrling have produced any documents concerning the arrangement with Fischer-Stuhrling created prior to August 2, 2017.  All of the documents containing reliable date information were created after August 2, 2017.  (Hr. Exs. J, K, L, M.)

Moreover, even if the Court does not find that the documentation establishes that the transaction took place on or about August 2, 2017, and even if the Court credits Friedmann's testimony (which it should not), Friedmann testified that the Move occurred after the Injunction by testifying that he was in Europe at the time of the Move:

> Q. It's a lot of inventory that you transferred, isn't it, sir?
> A. Yes, that's why it took several trips.
> Q. Seven trips.  Okay.
> A. Several trips.
> Q. Several trips.   That was my next question, which is: How did the inventory get moved from First SBF to Stuhrling?
> A. By Car.
> Q. By Car?

---

[12] Fischer admitted that Hearing Exhibit J was the first record he has seen that shows the transmission of invoices to Fischer-Stuhrling.  (Hr. Tr. 164:13-17.)

[13] The Audit trails show that the invoices relied on by NDG and Fischer-Stuhrling did not exist until August 2, 2018, because that is the first time that the amount of the invoice in the Audit Trails matched the amount listed on each of the invoices.  Hearing Exhibit F, Invoice No. 191089096, has a total amount of $3,362.050.55, and the August 2, 2018 entry on the Audit Trail for that invoice is the first entry with that amount.  Hearing Exhibit G, Invoice No. 191092814, has a total amount of $72,903.75, and the August 2, 2018 entry on the Audit Trail for that invoice is the first entry with that amount.  Hearing Exhibit H, Invoice No. 191093015, has a total amount of $1,940,166.10, and the August 2, 2018 entry on the Audit Trail for that invoice is the first entry with that amount.

A. Yes.
Q. And who - - what car?  A regular size car or a large car? What kind of car?
A. I don't know.
Q. Who owned the car?
A. I was not in the office.  I was traveling till the 23rd.  I was, I was in Europe.
. . . .
THE COURT: Okay.  How do you - - if you don't know when you left, how do you know you weren't there?
THE WITNESS: I remember I wasn't there.

(Hr. Tr. at 62:17-64:2.)  This is significant because Mr. Friedmann did not leave for Europe until June 18, 2017 [D.N. 152 ¶ 3] (Ex. P-2), and therefore the Move did not occur until (at the earliest) June 18, 2017, which was after the Injunction.

## I.    NDG destroyed or has wrongfully withheld evidence.

NDG destroyed the records of the Move that were created contemporaneously with the Move.  NDG claimed that handwritten notes and an Excel file existed at the time of the Move.  (See Hr. Tr. at 72:20-76:7.)  Despite the fact that the Move clearly occurred after Vertime instituted this litigation, Friedmann claimed at the hearing that he could not locate either the handwritten notes or the spreadsheet.  (Id.)  NDG has still not produced the handwritten notes.

The Court ordered NDG to produce the spreadsheet and its meta data.  On March 19, 2019, NDG produced a spreadsheet that it claims is the spreadsheet at issue.  [See D.N. 152.]  It also produced a screenshot of part of the properties dialog box (purportedly) associated with that spreadsheet.  (Ex. P-3.)  Not only did NDG apparently destroy all other versions of the spreadsheet and whatever hard-copy documents it had, prior to taking that screenshot on March 15, 2019, NDG made sure to destroy the relevant meta data by saving the spreadsheet, thereby destroying the meta data that would have revealed when NDG was last working with that spreadsheet in connection with its efforts to move the Products to Fischer-Stuhrling.  (Ex. P-3.)

**J.      Fischer knew about the Injunction, at the latest, in January 2018 and ignored it.**

Fischer admitted that he knew about the injunction in January 2018.  (Hr. Tr. at 169:8-

11.)  He found out when Vertime subpoenaed Samuel Schiff (id.), which occurred on January 19,

2018.  (Ex. P-4.)  He claims that if he knew about the injunction earlier, he would have stayed

away from the transaction:

> [T]he entire business is about reputation and this deal has really hurt my
> reputation a lot.  I've worked on it for 25 years.  Now I'm walking away
> faced with a really hurt reputation because I'm dealing in product that I
> shouldn't be dealing with.  It's something I didn't want, something I didn't
> need, and something I would do everything to keep away from.

(Hr. Tr. at 182:6-12.)  This after-the-fact claim is not credible because it does not correlate to his

actions.  Fischer sold the Products until late-July 2018; i.e., for approximately six months after

he admits he learned of the injunction. (See Hr. Ex. S; Hr. Tr. at 170:18-21.)  Despite having

"nothing to lose" he didn't "keep away," he kept selling until it was clear the Injunction would

be revised to expressly name Fischer-Stuhrling.

## III.    LEGAL STANDARD

"A party may be held in civil contempt for failure to comply with a court order if '(1) the

order the contemnor failed to comply with is clear and unambiguous, (2) the proof of

noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to

comply in a reasonable manner.'"  Shaoxing Bon Textiles Co. v. 4-U Performance Grp. LLC,

No. 16 CIV. 6805 (JSR), 2017 WL 6413993, at *8 (S.D.N.Y. Nov. 22, 2017) (citing Paramedics

Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 655 (2d Cir.

2004)).  "Civil contempt is intended either to coerce the contemnor into future compliance with

the court's order or to compensate the complainant for losses resulting from the contemnor's past

noncompliance."  Shady Records, Inc. v. Source Enterprises, Inc., 351 F. Supp. 2d 64, 66

(S.D.N.Y. 2004) (internal quotation marks omitted; citation omitted).  In adjudicating a Motion for Contempt, "sanctions should be calculated to coerce future compliance with the court's orders and to compensate the injured party for losses resulting from the contemptuous conduct." Chere Amie, Inc. v. Windstar Apparel, Corp., 175 F. Supp. 2d 562, 567 (S.D.N.Y. 2001).

"Civil contempt must . . . be shown by clear and convincing evidence." Haru Holding Corp. v. Haru Hana Sushi, Inc., No. 13 CIV. 7705 (RWS), 2016 WL 1070849, at *2 (S.D.N.Y. Mar. 15, 2016).  It is the moving party's burden to establish each element by clear and convincing evidence. Latino Officers Ass'n City of New York, Inc. v. City of New York, 558 F.3d 159, 164 (2d Cir. 2009).  Although sanctions may be imposed without a finding of willfulness, "[t]he Court may . . . consider whether a contemnor acted willfully in determining an appropriate sanction." Chere Amie, Inc., 175 F. Supp. 2d at 567.

District Court judges have broad discretion and flexibility to use civil contempt sanctions "to coerce compliance or to compensate a complainant for his actual losses." In re Stockbridge Funding Corp., 158 B.R. 914, 918 (S.D.N.Y. 1993); see also Haru Holding Corp., 2016 WL 1070849, at *2 ("[T]he Court has broad discretion in ordering a remedy to coerce future compliance and compensate the injured party for losses resulting from the contemptuous conduct.").  In imposing sanctions, the trial court properly considers the following factors: "(1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him." Haru Holding Corp., 2016 WL 1070849, at *2 (citing Dole Fresh Fruit Co. v. United Banana Co., 821 F.2d 106, 110 (2d Cir. 1987)).

## IV.    ARGUMENT

### A.    NDG AND FISCHER-STUHRLING SHOULD BE HELD IN CONTEMPT FOR VIOLATING THE INJUNCTION.

#### 1.    NDG has been in contempt since the Injunction issued.

NDG should be held in contempt because "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." Shaoxing Bon Textiles Co. v. 4-U Performance Grp. LLC, No. 16 CIV. 6805 (JSR), 2017 WL 6413993, at *8 (S.D.N.Y. Nov. 22, 2017) (citing Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 655 (2d Cir. 2004)).

The Injunction is clear and unambiguous: NDG, and anyone in active concert or participation with it, is prohibited from selling the Products. NDG did not diligently attempt to comply with the Injunction in a reasonable manner. Rather, it conspired to violate the Injunction by moving the Products to Friedmann's brother-in-law's warehouse and arranging for Fischer-Stuhrling to sell the Products and remit a portion of the sale price to NDG.

"[D]efendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." Regal Knitwear Co. v. N.L.R.B., 324 U.S. 9, 14 (1945). Injunctions are enforceable "against those to whom the business may have been transferred, whether as a means of evading the judgement or for other reasons." Computer Searching Serv. Corp. v. Ryan, 439 F.2d 6 (2d Cir. 1971) (internal quotation marks omitted; citation omitted). Carrying on the business of one who is enjoined is active concert and participation. See id. and cases cited therein. NDG has entered into an arrangement whereby Fischer-Stuhrling completed the sales of the very products NDG was enjoined from selling and then remitted part of the payment received from each sale to NDG. In

other words, NDG used Fischer-Stuhrling to sell the Products for it, because it could not sell the Products itself.

The evidence of NDG's non-compliance is clear and convincing, because all of the evidence (other than Friedmann's unsupported claims to the contrary) shows that the Move occurred after the Injunction.  First, all of the documentary evidence shows that NDG moved the Products to Fischer-Stuhrling on or about August 2, 2017.  (Hr. Exs. J, K, L, M.)  Second, Fischer-Stuhrling's first sale was on September 14, 2017.  (Hr. Ex. S.)  Third, even if Friedmann's testimony is credited, he testified that the Move occurred while he was in Europe, which means that it occurred no sooner than June 18, 2017.  Moreover, even if the Move occurred during the injunction hearing (which it did not), the entirety of Fischer-Stuhrling's sales of the Products and payments to NDG occurred *after the Injunction issued*, and NDG made false representations to this Court to conceal what it had done with the Products.

Finally, Vertime is entitled to an adverse inference due to NDG's spoliation and continued refusal to produce documents and information highly relevant to Vertime's Contempt Motion.  See, e.g., Fed. R. Civ. P. 37; Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona, 138 F. Supp. 3d 352 (S.D.N.Y. Sept. 29, 2015).

### 2.    Fischer-Stuhrling has been in contempt since, at least, January 2018.

Common sense shows that Fischer – who is Friedmann's brother-in-law, who is or was business partners with him (Hr. Tr. at 154:9-156-18), and who is also in the watch business – knew about Friedmann's/NDG's troubles at the time he agreed to try to sell the watches.  Even if Fischer-Stuhrling is given the benefit of the doubt regarding when it knew of the Injunction, it has been acting in violation of the Injunction since, at least, January 19, 2018, when Vertime subpoenaed Fischer-Stuhrling's employee, Samuel Schiff.

After it learned that there was an Injunction, Fischer-Stuhrling made absolutely no attempt to comply.  As Mr. Fischer stated, in his opinion, he had nothing to lose: "The deal was structured in a way where it really didn't affect me, other than my reputation."  (June 26, 2018 Tr. at 132-33.)  Moreover, Fischer-Stuhrling has conceded that as of June 26, 2018, it was actively trying to sell the Products; and Hearing Exhibit S shows that those sales continued through late July 2018.  This is clear and convincing evidence of Fischer-Stuhrling's non-compliance.

### B.    APPOINTMENT OF A RECEIVER IS THE ONLY REASONABLE WAY TO ENSURE COMPLIANCE WITH THE INJUNCTION.

Vertime moves for the appointment of a receiver to ensure compliance with the Injunction, and this Court has the authority to appoint a receiver for that purpose:

> [Where] [t]he more usual remedies contempt proceedings and further injunctions [are] plainly not very promising, as they invite[] further confrontation and delay; and when the usual remedies are inadequate, a court of equity is justified, *particularly in aid of an outstanding injunction*, in turning to less common ones, such as a receivership, to get the job done.

Morgan v. McDonough, 540 F.2d 527, 533 (1st Cir. 1976) (emphasis added); Omaha Indem. Co. v. Wining, 949 F.2d 235, 239 (8th Cir. 1991) (same, citing Morgan); Dixon v. Barry, 967 F. Supp. 535, 550 (D. D.C. June 13, 1997) (citing Morgan: "Pursuant to its equity jurisdiction, a federal court has power to take broad remedial action to effectuate compliance with its orders. This equitable power includes the power to appoint a receiver."); see U.S. v. American Tobacco Co., 221 U.S. 106, 187-88 (1911) (ordering that if parties don't effectuate disintegration of tobacco companies within time allowed, court will appoint receiver to effectuate order); Society for Good Will to Retarded Children, Inv. v.Carey, 466 F. Supp. 722, 727 (E.D.N.Y. Feb. 21, 1979) ("In extreme situations, where defendants have failed to respond to court directive,

receivers may be appointed"); <u>Alps South, LLC v. Ohio Willow Wood Company</u>, No. 8:08-cv-1893, 2013 WL 12161867 at *7-*9 & *11 (M.D. Fl. Nov. 12, 2013) (appointing receiver in patent infringement case to ensure compliance with injunction after continued contemptuous sales by sequestering products in warehouse).  Just as in these cases, appointment of a receiver is appropriate in this case to ensure compliance with the Injunction.

Appointment of a receiver is the only reasonable way to ensure compliance with the Injunction.  NDG and Fischer-Stuhrling have acted in flagrant disregard of the Injunction and with absolutely no regard for the authority of this Court.  Indeed, at the same time NDG was representing to this Court that it had respect for the process, it was purportedly working with Fischer-Stuhrling to continue to sell the Products in a manner concealed from Vertime and the Court.  Fischer-Stuhrling claims that it has complied with the injunction; however, Fischer claimed that his company did not keep a record of what it received or what it sold.  Therefore, ensuring Fischer-Stuhrling's compliance would be near impossible if the Products were left in its possession.

If the Court appoints a receiver, Vertime (via its designee, Geodis) should act as the receiver, to save costs.  Vertime requests that the Court order NDG to pay for shipment of the Products to the warehouse of Geodis for storage pending further order of the Court. Geodis provides logistics services to Vertime.[14]  NDG should pay for the costs of the receiver, because it is NDG's violation of the Injunction that created the need for a receivership.

---

[14] "GEODIS is a Supply Chain Operator ranking among the top companies in its field in Europe and the World. GEODIS, which is part of SNCF Logistics, which in turn is a business line of the SNCF Group, is the number one Transport and Logistics operator in France and ranked number four in Europe. The international reach includes a direct presence in 67 countries and a global network spanning over 120 countries. With its five Lines of Business (Supply Chain Optimization, Freight Forwarding, Contract Logistics, Distribution & Express and Road Transport), GEODIS manages its customers Supply Chain by providing end-to-end solutions enabled by our people, our infrastructure, processes and systems." (www.geodis.com/about-us-@/en/view-1866-category.html/1864.)

## C.    NDG AND FISCHER-STUHRLING SHOULD BE SANCTIONED FOR THEIR VIOLATION OF THE INJUNCTION.

"The imposition of civil contempt sanctions may serve dual purposes: to secure future compliance with court orders and to compensate the party that has been wronged." Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 657 (2d Cir. 2004).  To the extent a receiver is appointed, sanctions should not be necessary to ensure compliance with the Injunction.  Nevertheless, Vertime has been damaged by NDG's and Fischer-Stuhrling's violations of the Injunction, and therefore, Vertime seeks an award of compensatory sanctions.[15]

Vertime has been harmed by NDG's and Fischer-Stuhrling's contempt in two ways. First, every sale made in violation of the Injunction was a sale that Vertime was unable to make through its new distributor.  Therefore, Vertime requests that the Court enter an order disgorging all of NDG's profits from the date of the Injunction, and Fischer-Stuhrling's profits for any sales made after January 19, 2018.  Manhattan Industries, Inc. v. Sweater Bee by Banff, 885 F.2d 1, 5-6 (2d Cir. 1989), cert denied, 494 U.S. 1029 (1990) (holding that profits are a measure of damages for contempt); GMA Accessories, Inc. v. Eminent, Inc., No. 07-cv-3219 (LTS)(DF), 2008 WL 2355826, at *9-*10 (S.D.N.Y. May 29, 2008) (same).  Further, because the burden of proof with regard to expenses that may be deducted from gross revenue to calculate profit is on the contemnor, Manhattan Industries, Inc., 885 F.2d at 7, Vertime requests that the Court enter an order disgorging all sale proceeds remitted to NDG from any source, unless NDG can prove that the specific watches that were sold were not the watches for which it has failed to pay Vertime.  For any Products for which NDG failed to pay Vertime, the entire amount received by

---

[15] As noted above, pursuant to the Court's direction, Vertime will address its damages after the Court rules on this Motion.

NDG is profit.

Second, Vertime requests that the Court require NDG and Fischer-Stuhrling to jointly and severally reimburse the attorney's fees and expenses incurred by Vertime in investigating and litigating NDG's and Fischer-Stuhrling's violations of the Injunction. Willfulness is not required to impose an attorney's fee sanction; however, it is a factor that weighs heavily in favor of doing so. See Shady Records, Inv. v. Source Enterprises, Inc., 351 F. Supp. 2d 64, 66-68 (S.D.N.Y. 2004). "A willful contempt is one where the contemnor had actual notice of the court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply." GMA Accessories, Inc., 2008 WL 2355826 at *10.

It cannot reasonably be disputed that NDG willfully violated the Injunction from the moment it was entered, and Fischer-Stuhrling's violation of the Injunction was equally willful (since at least January 2018). Therefore, NDG and Fischer-Stuhrling should be ordered to reimburse Vertime for its attorney's fees and expenses incurred investigating NDG's and Fischer-Stuhrling's violations of the Injunction, which Vertime will address following the Court's order on this Motion. See id.

## D.    NDG SHOULD BE SANCTIONED FOR ITS FALSE AND MISLEADING STATEMENTS.

NDG repeatedly represented to the Court and Vertime that it was compliant with the injunction, had possession of the Products, and was not selling them. This was untrue, and NDG did not, and still has not, taken any steps to correct its false and misleading statements. Rather, Vertime was forced to incur substantial attorney's fees and expenses to discover the true status of the Products to protect its rights under the Injunction. Moreover, the harm sought to be prevented by the Injunction continued to occur due to NDG's contempt, which was made possible by its false and misleading statements.

NDG also repeatedly falsely represented to the Court and Vertime that the invoices marked as Hearing Exhibits F, G, and H were created on or very near the dates included on those invoices.[16]  NDG's false statements in this regard continued through the Hearing, and were proven false only *after* the Hearing by NDG's severely late production of the QuickBooks Audit Trails.

Friedmann also made false statements in his September 12, 2018 Declaration in opposition to the First Motion.  He falsely claimed that NDG temporarily ceased sales of the products at issue for thirty days through May 22, 2017.  (Hr. Ex. A ¶ 2.)  This is proven false by Hearing Exhibit B, which shows the sales NDG made between April 22 and May 22, 2017.  He also falsely claimed that NDG didn't sell or otherwise dispose of any products after the Injunction.  (Hr. Ex. A ¶ 7; Hr. Tr. at 15-10:16.)  This is proven false by Hearing Exhibit C which shows sales on and after June 15, 2017.

This Court has an inherent power to sanction NDG for its improper conduct.[17]  Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 336 (2d Cir. 1999).  As explained in Chambers v. Nasco, Inc., 501 U.S. 32, 45-46 (1991):

> [A] court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.  In this regard, if a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party, as it may when a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order. The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of vindicating judicial authority without resort to the more drastic sanctions

---

[16] As discussed above, NDG's claim that there were three separate sales was also contradicted by Friedmann's and Fischer's testimony.

[17] Vertime presently has no reason to believe that NDG's prior counsel was complicit in NDG's false statements. Therefore, Vertime is not proceeding under Rule 11.  Rather, it appears that NDG itself orchestrated the campaign of false information and used its prior counsel to do so (presumably) unwittingly.

> available for contempt of court and making the prevailing party whole for
> expenses caused by his opponent's obstinacy.

(Internal quotation marks omitted.)  "Although courts should ordinarily look to specific rules or statutes-such as Rule 11 and Section 1927-to sanction bad-faith conduct, 'if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.'"  <u>Homkow v. Musika Records, Inc.</u>, No. 04 CIV. 3587 KMW THK, 2009 WL 721732, at *24 (S.D.N.Y. Mar. 18, 2009) (quoting <u>Chambers</u>, 501 U.S. at 45-46).

Vertime was forced to conduct extensive investigation and research to determine the identity of the entity(ies) that were continuing to sell the Products in violation of the Injunction. Once it determined one source (EvergreenCreations), Vertime was forced to depose third-parties (which involved significant motion practice) to learn the truth about NDG's continued sales via Fischer-Stuhrling.  Further, even after this non-compliance was revealed, Vertime was forced to prosecute the First Motion for more than a year to seek the Court's assistance in forcing compliance with the Injunction.  If NDG informed the Court of its transfer of the Products to Fischer-Stuhrling, instead of making false and misleading statements designed to conceal the transfer, Vertime would not have incurred any of these fees and expenses, and would have been able to promptly secure compliance with the Injunction, to prevent the harm suffered in the market.

Therefore, Vertime requests that the Court impose sanctions on NDG for its false and misleading statements (which have still not been corrected), by awarding Vertime its attorney's fees and expenses that were necessitated thereby, and by awarding Vertime damages for the harm caused by NDG's continued sales.[18]

---

[18] As noted above, pursuant to the Court's direction, Vertime will address its damages after the Court rules on this Motion.

### E.    FISCHER-STUHRLING SHOULD BE SANCTIONED FOR ITS FALSE AND MISLEADING STATEMENTS CONCERNING THE DATE OF THE MOVE.

Fischer-Stuhrling repeatedly represented that the invoices marked as Hearing Exhibits F, G, and H were "received with the deliveries on June 13 and 14, 2017." [D.N. 142 at 2.] The Audit Trails prove that those documents did not exist until August 2, 2017, and therefore could not have been "received . . . on June 13 and 14, 2017." Fischer-Stuhrling's false representations, coupled with its continued withholding of the truth, have caused Vertime to incur significant expenses in an effort to discover and prove the truth. Therefore, Vertime requests that the Court impose sanctions on NDG for its false and misleading statements (which have still not been corrected), by awarding Vertime its attorney's fees and expenses that were necessitated thereby.

## V.    CONCLUSION

For the foregoing reasons, Vertime respectfully requests that the Court: (1) hold NDG and Fischer-Stuhrling in contempt of the Injunction; (2) appoint Vertime's designee, Geodis, as a receiver of the Products and order NDG to pay to ship the Products to Geodis' warehouse; (3) sanction NDG and Fischer-Stuhrling for their violations of the Injunction; and (4) sanction NDG and Fischer-Stuhrling for their false and misleading statements that necessitated and compounded the expense associated with this Motion and the First Motion.

**Respectfully submitted,**

Date:  August 17, 2022          By:    /s/Todd R. Michaelis (TM6839)
                                       Ann H. Rubin (*pro hac vice*)
                                       Todd R. Michaelis (TM6839)
                                       Carmody Torrance Sandak & Hennessey LLP
                                       50 Leavenworth Street
                                       Waterbury, Connecticut 06721
                                       Tel:  203-573-1200
                                       Fax:  203-575-2600
                                       Email: arubin@carmodylaw.com
                                              tmichaelis@carmodylaw.com

{W3422479}                    26

## **CERTIFICATION**

I hereby certify that on the above date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

       /s/ Todd R. Michaelis (TM6839)

Todd R. Michaelis
