UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VERTIME B.V., : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> NEW DOVER GROUP, LTD., : <br> : <br> Defendant. : | CIVIL ACTION NO. 7:17-cv-03844(KMK) |

**REPLY IN FURTHER SUPPORT OF POST-BANKRUPTCY RENEWED
MOTION FOR CONTEMPT, SANCTIONS, AND TO APPOINT RECEIVER**

**I.   INTRODUCTION**

Plaintiff Vertime B.V. submits this reply in further support of its August 17, 2022 Post-Bankruptcy Renewed Motion for Contempt, Sanctions, and to Appoint Receiver ("Motion") (Dkt. No. 183) in response to the memoranda in opposition filed by Fischer-Stuhrling[1] (Dkt. No. 185) (the "FS Opposition") and NDG (Dkt. No. 188) (the "NDG Opposition") (collectively, the "Oppositions"). The Oppositions are premised on claim that NDG sold the Products to Fischer-Stuhrling on June 11, 2017, via a handshake at a wedding. If this was true, one would expect that they would have informed the Court of this when Vertime first started these contempt proceedings. Yet they did not.

Instead, Fischer-Stuhrling represented to this Court that the purchases "occurred on June 13 and 14, 2017, as evidenced by the invoices" (Dkt. No. 103 at 2) and NDG represented that the "invoices all indisputably reflect dates of sale prior to the entry of the preliminary injunction" (Dkt. No. 105 at 1). Neither mentioned anything about a handshake at a wedding or a date of June 11, 2017. They only do so now because they got caught backdating the invoices.

---

[1] Capitalized terms have the same meaning given to them in the Motion.

Mr. Werzberger's testimony about his telephone call with Friedmann, after the June 13, 2017 injunction hearing, also undercuts NDG's and Fischer-Stuhrling's (false) assertions. Mr. Werzberger testified:

> When I finished testifying here, I was told – I called Mr. Friedmann to tell – to let him know that we were done here, and I did tell him that I think the Judge had not ruled yet and that if he has an opportunity, he should try to sell it, and he asked me "Am I allowed to?" And I said, "I'll double-check with the attorney" at the time.

(Hr. Tr. at 193:12-24.) If what NDG and Fischer-Stuhrling assert in their Oppositions were true – that the deal was complete on June 11, 2017 – Friedmann would have never asked Mr. Werzberger if he was allowed to sell the watches. He would have told him they were already sold.

The evidence of NDG's non-compliance is clear and convincing because all of the evidence (other than self-serving, undocumented claims to the contrary) shows that the Move occurred after the Injunction. First, all of the documentary evidence shows that NDG moved the Products to Fischer-Stuhrling on or about August 2, 2017. (Hr. Exs. J, K, L, M.) Second, this is corroborated by the fact that Fischer-Stuhrling's first sale was on September 14, 2017. (Hr. Ex. S.) If the watches were moved on June 13 and 14, 2017, and Fischer wanted to sell them within a year, why did he wait three months to make the first sale? Third, even if Friedmann's testimony is credited, he testified that the Move occurred while he was in Europe, which means that it occurred no sooner than June 18, 2017.

The gravamen of the Oppositions is essentially that, notwithstanding the documents, testimony, and initial representations that show that they moved the watches after the Injunction, if the brothers-in-law come to court and say that they had a handshake deal a few days before the Injunction, then they can't be held in contempt (even if that handshake deal didn't include

quantity, price, or payment terms). This is transparent nonsense and fails to recognize the reason the Court held the hearing in the first place: it saw credibility issues (even before Friedmann and Fischer revealed that they were family). And NDG does not stop there, it also incredibly argues that this court should not hold it in contempt because after the Injunction, on August 2, 2017, it created three invoices that say that NDG transferred the watches before the Injunction. (NDG Opp. at 16.) The disingenuity of these claims is stunning.

II. ARGUMENT

    A. Reply to Fischer-Stuhrling's Opposition

        *1. Fischer-Stuhrling premises its Opposition on the wrong legal standard: Vertime does not request the court to fine or penalize respondents.*

In the Motion, Vertime seeks compensatory damages and attorney's fees and expenses. Vertime does not ask the court to impose any kind of a penalty or fine on respondents. (Mot. at 21-22.) Fischer-Stuhrling's assertions to the contrary (FS Opp. at 12) are incorrect and not supported by any citation to the Motion. Therefore, Fischer-Stuhrling's analysis with regard to the standard for fines or criminal penalties is not applicable here.

        *2. The timing of the Move matters because there is no credible evidence of a sale or any other form of transaction.*

The credible evidence of the timing of the contemptuous act at issue includes the invoices, created on August 2, 2017, coupled with prior representations that the Move was contemporaneous with the invoices. Fischer-Stuhrling initially and repeatedly asserted that the invoices were the evidence of the date of the transaction. (*See* Mot. at 8-11.) Fischer-Stuhrling's attempt to change course now – "As it turns out, those invoices were delivered later" (Mot. at 18-

19) – is simply not credible.[2] The brothers-in-law tried to slip one past Vertime and the Court by backdating invoices, but they have been caught.[3]

### 3. *Fischer's assertion that he agreed to Friedmann's payment terms is not credible.*

Fischer testified, at his deposition and at the hearing that he only paid when he got paid. (*See* Mot. at 6.; Hr. Tr. at 173:17-18.) Despite this, and with no testimony that expressly contradicts the testimony in which Fischer said he did not agree to Friedmann's one-year terms (*see* Mot. at 6-7), Fischer-Stuhrling now claims that Fischer actually did agree to Friedmann's one-year payment terms (FS Opp. at 8, 15). The evidence does not support this claim.

First, the referenced testimony was given when Fischer was being examined by his own attorney, and nevertheless, he did not actually testify that he agreed to Friedmann's request for one-year payment terms. He testified that he thought he could sell the watches within a year. (Hr. Tr. at 178-19.) Second, he clearly, and unequivocally testified that he did not agree to pay within a year and that because of that, he had "nothing to lose." (*See* Mot. at 6-7; *see also* Hr. Tr. 174:2-3 ("Q. Did you ever agree to that? A. I tried not to.").)

Fischer-Stuhrling argues that the Uniform Commercial Code fills in the missing parts of the purported sale of goods by asserting: "Defendant . . . set forth a purchase price that was agreed upon on their invoices." (FS Opp. at 15-17.) This assertion does nothing other than highlight the fact that there was no transaction until the time of the invoices, which did not exist until August 2, 2017. (*See* Ex. P-1; Mot. at 13, n. 13.)

---

[2] Fischer-Stuhrling also tries but fails to minimize the importance of the invoices by asserting: "The audit trails demonstrate only that the invoices were edited on numerous occasions before taking their final form." (FS Opp. at 14.) This is what the audit trails show, and it is highly significant, because it shows that the backdated invoices that Fischer-Stuhrling and Friedmann represented to this court coincided with the Move, did not exist until August 2, 2017. They also show that they were not in their "final form" until late October 2017.

[3] Fischer-Stuhrling's assertion of no evidence of the move occurring after the Injunction also fails to account for Friedmann's testimony that the move occurred while he was in Europe, which was also after the Injunction. (*See* Mot. at 13-14.)

There was no sale of goods because Fischer-Stuhrling's nothing-to-lose involvement was to clandestinely sell the watches for NDG in an effort to avoid the Injunction that presented a significant problem for his brother-in-law. But even if there was a sale, it was completed *after* the Injunction was issued.

### 4. *Fischer's assertion of good faith is not credible.*

Fischer knew of the Injunction, at the latest, on January 19, 2018. (*See* Mot. at 18-19.) Yet, Fischer-Stuhrling continued sales through July 2018. Despite this, Fischer asserts: "he would not have undertaken this transaction had he been aware of the ongoing proceedings." (FS Opp. at 17.) Common sense dictates that Fischer – Friedmann's brother-in-law who is also in the watch business – knew of the Injunction the whole time. As Fischer testified:

> I made it clear to him that I can take the goods, I can buy the goods, but it's going to have to be at my terms and it's going to have to be at a very, very significant discount. . . . He wasn't happy. He pushed and asked me to actually, you know, buy it and pay at his terms. But I didn't agree. **And the last I know, it was sometime in June, he said, all right, I guess you win.**

(Ex. P-8: June 26, 2018 Tr. at 33:3-24 (emphasis added).) But even if he is given the benefit of the doubt, which he should not be, he absolutely knew in January 2018, yet he did not change course. He kept on selling. His assertions of good faith don't add up.

### 5. *If the Court rejects the June 11, 2017 sale assertion, Fischer-Stuhrling does not dispute that it was in contempt as of January 2018.*

Fischer-Stuhrling asserts that the sales occurring after Fischer was *admittedly* aware of the Injunction were not contemptuous only because Fischer-Stuhrling was free to sell the products because it purchased them before the Injunction. (FS Opp. 19-25.) Fischer-Stuhrling does not dispute that if the Court finds that either there was no real sale or it occurred after the Injunction, then Fischer-Stuhrling was in contempt as of January 19, 2018, at the latest. (*Id.*)

### 6. The Injunction complies with Rule 65

Fischer-Stuhrling asserts that the Injunction "defined the items prohibited from being sold by reference to a contract." (FS Opp. at 22.) This is incorrect. The original Injunction clearly stated that "NDG, and all persons acting in active concert or participation with it, shall not offer to sell, accept any offer to sell, or enter into the sale of any part or all of the remaining stock of the Products . . . ." (Dkt. No. 36.) It clearly defined the term "Products" as "Salvatore Ferragamo, Versace, and/or Versus timepieces." (*Id.*) The reference to the "Agreements attached to the Verified Complaint as Exhibits A, B, and C" pertained to the former rights of NDG to distribute the products and to the conditions under which NDG could remove itself from the Injunction. It was not part of the description of the acts restrained. The Injunction complied with Rule 65.

## B. Reply to NDG's Opposition

### 1. The Court has subject matter jurisdiction over New Dover Group, LLC and there is no authority for NDG's assertion to the contrary.

This Court has subject matter jurisdiction and NDG's assertions to the contrary are baseless and contradicted by binding Second Circuit authority. Indeed, NDG's assertion that its defunct or inactive status deprives this court of subject matter jurisdiction is frivolous. (NDG Opp. at 6-12.) NDG is essentially claiming that the court lost subject matter jurisdiction when NDG became insolvent, and the case law on which NDG purports to rely is so obviously inapposite that Vertime will not discuss it here.

Courts routinely find that they have subject matter jurisdiction over defunct or inactive corporations. *See, e.g.*, *Dorchester Financial Holdings Corp. v. Banco BRJ, S.A.*, No. 11-cv-1529, 2016 WL 845333 (S.D.N.Y. Mar. 2, 2016); *Dover Limited v. Assemi*, No. 08-cv-1337, 2009 WL 2870645 (S.D.N.Y. Aug. 5, 2009); *Jones v. Dana*, No. 06-cv-0159, 2006 WL 1153358 (S.D.N.Y. May 2, 2006); *U.S. v. Dyna Magnetic Devices*, No. 82-cv-3770, 1987 WL 6904

(S.D.N.Y. Feb. 11, 1987). Indeed, with regard to diversity cases, courts in the Second Circuit will find an "inactive corporation's principal place of business to be the state where it last transacted business." *Pinnacle Consultants, Ltd. v. Leucadia National Corp.*, 101 F.3d 900, 907 (2d Cir. 1996); *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 141 (2d Cir. 1991); *Bonnie & Company Fashions, Inc. v. Bankers Trust Co.*, 18 F.Supp.2d 297 (S.D.N.Y. Aug. 21, 1998). NDG's assertion that its "inactive" status deprives the Court of subject matter jurisdiction is meritless.

Not only is it wrong as a matter of law, if the court were to find that NDG actually sold the Products to Fischer-Stuhrling with one-year payment terms, then it is not defunct as it has a multi-million dollar claim against Fischer-Stuhrling that Vertime could pursue in satisfaction of any monetary relief awarded here. And with regard to the Injunction, an inactive NDG can comply as easily as an active NDG, because the Injunction prevents NDG from acting. Moreover, it would be a logical to infer that if NDG were freed from the Injunction, it would quickly become active to resume sales of the Products, or at least to resume receiving its cut from Fischer-Stuhrling.

   2. ***NDG's attempt to minimize the audit trails is misleading and fails.***

Further reinforcing NDG's lack of credibility, it asserts: "On their face, the audit trails show than an invoice for a large, multi-million-dollar transaction with Fischer-Stuhrling was first created on June 20, 2017." (NDG Opp. at 15.) This is not true. The audit trail for invoice number 191089096 reflects that it was created on May 22, 2017, with a "Name" of "Royal Trading Comp," and that the "Name" was changed to "Stuhrling Original" on June 20, 2017 (which, of course, is after the Injunction). (Ex. P-1.) The audit trails for the other two invoices show that

they were not created until July 17, 2017 (no. 191092814) and July 19, 2017 (no. 191093015). (Ex. P-1.)

Unbelievably, NDG asserts that the court should credit the "Date" on each of the invoices (June 13 and 14, 2017) notwithstanding that the audit trails show they were not created until August, because "that is what the invoices say." (NDG Opp. at 16.) In other words, NDG argues that this court should not hold it in contempt because, after the Injunction, on August 2, 2017, it created three invoices that "say" that NDG transferred the watches before the Injunction. (*See* NDG Opp. at 16.) This argument is, at best, meritless.

### 3. The Court should, at a minimum, reject Friedmann's attempt to change his testimony.

At the hearing, when Friedmann claimed he was in Europe at the time of the Move, the Court interjected and questioned Friedmann:

> THE COURT: When were you in Europe?
> THE WITNESS: I went to Europe. Monday I went. First I went - -
> THE COURT: When did you go to Europe?
> THE WITNESS: I remember I came back the 23rd. It was Friday the 23rd I came back.
> THE COURT: When did you first leave for Europe?
> THE WITNESS: I remember I wasn't in the office.
> THE COURT: That's not my question. When did you leave for Europe?
> THE WITNESS: I have to check.
> THE COURT: You have to check what?
> THE WITNESS: When I left.
> THE COURT: Okay. How do you – if you don't know when you left, how do you know you weren't there?
> THE WITNESS: I remember I wasn't there.
> THE COURT: Next question. Do you have your passport around?
> THE WITNESS: I don't have it here.
> THE COURT: Where is it?
> THE WITNESS: At home.
> THE COURT: Maybe we'll want to see the passport.

(Hr. Tr. 63:12-64:9.)

After the hearing, Friedmann produced flight records that showed that he went to Frankfurt on June 18, 2017. (Ex. P-2.) He did not submit an affidavit or contact counsel or the court in any way to attempt to "correct" his testimony. Now, however, Friedmann claims that his trip to Europe "was a separate trip from my being out of office after June 11." Of course, he does not provide any evidence confirming that he was "out of office after June 11." Indeed, he does not even say where he claims to have been. He is simply not believable and is clearly fabricating.

NDG also asserts that the fact that Mr. Werzberger spoke to Friedmann on the phone after his testimony, instead of in person, means Friedmann was out of the office. (NDG Opp. at 17.) This is ridiculous. Mr. Werzberger spoke to Friedmann on the phone because Mr. Werzberger was out of the office to be the NDG witness at the injunction hearing. The fact that this conversation was over the phone does not imply that Friedmann was out of the office.

NDG also asserts: "In short, a necessary link in Vertime's chain of logic is the mistaken belief that when Mr. Friedmann said he "was not in the office" when the Products were transferred, he must have meant that he was in Europe. That is not true." (NDG Opp. at 17.) Whether or not it was true, that is what Friedmann testified:

> Q.   It's a lot of inventory that you transferred, isn't it, sir?
> A.   Yes, that's why it took several trips.
> Q.   Seven trips. Okay.
> A.   Several trips.
> Q.   Several trips. That was my next question, which is: How did the inventory get moved from First SBF to Stuhrling?
> A.   By car.
> Q.   By car?
> A.   Yes.
> Q.   And who – what car? A regular size car or a large car? What kind of car?
> A.   I don't know.
> Q.   Who owned the car?
> A.   I was not in the office. I was traveling till the 23rd. I was, I was in Europe.

> Q. So, who directed the move of – the transfer of the inventory to Stuhrling? Who at SBF?
> A. The Shipping Department.
> THE COURT: When were you in Europe?

(Hr. Tr. at 62:17-63:12.)

Friedmann's attempt to change his testimony by saying, oh no, it wasn't the trip to Europe, it was some other unspecified time out of the office (NDG Opp. at 17; Friedmann Decl. ¶ 20), is simply not credible. NDG's attempt to argue that Friedmann didn't say what he said is also not credible.

### 4. *The Court should draw adverse inferences against NDG for its discovery non-compliance and spoliation.*

NDG asserts that "[t]o the extent there are gaps in NDG's productions, this is readily explained by the age of the litigation and the informal nature of NDG's typical recordkeeping." (NDG Opp. at 18.) The events at issue for which NDG's document production was incomplete occurred *during this litigation*. To assert that noncompliance was due to some sort of timing issue and that there is no need to infer malice when NDG has been shown to have created backdated records on which it continues to rely for its defense is nonsensical. The only reasonable inference is malice: that NDG was trying to hide its actions from the Court, as Friedmann admitted. (*See* Mot. at 11-12.)

## III. CONCLUSION

On August 2, 2017, NDG Moved the Products and created backdated invoices. Before that was known, NDG and Fischer-Stuhrling relied on these invoices as proof of when the "sale" occurred. Now that Vertime has proven they were backdated, NDG and Fischer-Stuhrling claim the "sale" was complete upon a handshake at a wedding on June 11, 2017. The credible evidence clearly and convincingly shows that this is not true and that the Court should grant the Motion.

**Respectfully submitted,**

Date: October 13, 2022         By:   /s/Todd R. Michaelis (TM6839)
                                                                     Ann H. Rubin (*pro hac vice*)
                                                                     Todd R. Michaelis (TM6839)
                                                                     Carmody Torrance Sandak & Hennessey LLP
                                                                     50 Leavenworth Street
                                                                     Waterbury, Connecticut 06721
                                                                     Tel: 203-573-1200
                                                                     Fax: 203-575-2600
                                                                     Email: arubin@carmodylaw.com
                                                                              tmichaelis@carmodylaw.com

## **CERTIFICATION**

I hereby certify that on the above date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

                                                    /s/ Todd R. Michaelis (TM6839)
                                               Todd R. Michaelis