UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------:

VERTIME B.V.
               Plaintiff,

-against-                     CASE NO. 7:17-CV-03844-KMK

NEW DOVER GROUP, LTD.
               Defendant.

---------------------------------------------:

### VERTIME'S SUBMISSION IN SUPPORT OF ITS CLAIM FOR DAMAGES FOR CONTEMPT

Vertime makes this submission in support of its claim for damages for contempt by New Dover Group, Chaim Fischer and Stuhrling, in accordance with the Court's order [Minute Entry 11/13/25].

Vertime claims the following damages:

1. Appointment of a receiver;

2. An order directing defendants to pay for the costs of delivering the Product to the receiver; and to pay the costs of the receiver, jointly and severally;

3. An order of compensatory sanctions against all defendants, jointly and severally;

4. An order disgorging all of NDG's profits from the date of the Injunction;[1] and Fischer-Stuhrling's profits for any sales made after January 19, 2018;

5. An order directing NDG and Fischer-Stuhrling jointly and severally to reimburse the attorney's fees and costs incurred by Vertime in investigating and litigating

---

[1] NDG's profits are all sale proceeds remitted to NDG from any source, unless NDG can prove that the specific watches that were sold were not the watches for which it has failed to pay Vertime. For any Products for which NDG failed to pay Vertime, the entire amount received by NDG is profit.

1

NDG's and Fischer-Stuhrling's violations of the Injunction, which total $149,753.73 as set forth in the Declaration of Ann H. Rubin, submitted herewith.

A. **Defendants' Violations of the Injunction Warrant an Order of Contempt**

NDG violated the Injunction by selling or otherwise transferring the Products to Fischer-Stuhrling after the Court granted the Injunction. NDG's and Fischer-Stuhrling's violations are established by the astonishing record before this Court – a record that includes the Injunction hearing (requiring three days of evidence) and several later proceedings. The contempt is proved by witness testimony from Mr. Friedman, Mr. Werzberger, Mr. Schiff, and Mr. Fischer; and by documents produced by NDG and Fischer, as detailed in the Motion.

Vertime should be compensated for its damages caused by the contempt. "Civil contempt is intended either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance." Shady Records, Inc. v. Source Enterprises, Inc., 351 F. Supp. 2d 64, 66 (S.D.N.Y. 2004) (internal quotation marks omitted; citation omitted). In adjudicating a Motion for Contempt, "sanctions should be calculated to coerce future compliance with the court's orders and to compensate the injured party for losses resulting from the contemptuous conduct." Chere Amie, Inc. v. Windstar Apparel, Corp., 175 F. Supp. 2d 562, 567 (S.D.N.Y. 2001). District Court judges have broad discretion and flexibility to use civil contempt sanctions "to coerce compliance or to compensate a complainant for his actual losses...." In re Stockbridge Funding Corp., 158 B.R. 914, 918 (S.D.N.Y. 1993); see also Haru Holding Corp. v. Haru Hana Sushi, Inc., 2016 WL 1070849, at *2 ("[T]he Court has broad discretion in ordering a remedy to coerce future compliance and compensate the injured party for losses resulting from the contemptuous conduct."). In imposing sanctions, the trial court properly considers the following factors: "(1) the character and

magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him." Haru Holding Corp., 2016 WL 1070849, at *2 (citing Dole Fresh Fruit Co. v. United Banana Co., 821 F.2d 106, 110 (2d Cir. 1987)).

**B.      Appointment of A Receiver is the Only Reasonable Way to Ensure Compliance with the Injunction.**

Vertime moves for the appointment of a receiver to ensure compliance with the Injunction, because NDG's and Fischer-Stuhrling's conduct of record proves that the "usual" contempt remedies are inadequate. This Court has the authority to appoint a receiver to ensure compliance with the Injunction:

> [Where] [t]he more usual remedies contempt proceedings and further injunctions [are] plainly not very promising, as they invite further confrontation and delay; and when the usual remedies are inadequate, a court of equity is justified, *particularly in aid of an outstanding injunction*, in turning to less common ones, such as a receivership, to get the job done.

Morgan v. McDonough, 540 F.2d 527, 533 (1st Cir. 1976) (emphasis added); Omaha Indem. Co. v. Wining, 949 F.2d 235, 239 (8th Cir. 1991) (same, citing Morgan); Dixon v. Barry, 967 F.Supp. 535, 550 (D. D.C. June 13, 1997) (citing Morgan: "Pursuant to its equity jurisdiction, a federal court has power to take broad remedial action to effectuate compliance with its orders. This equitable power includes the power to appoint a receiver."); see U.S. v. American Tobacco Co., 221 U.S. 106, 187-88 (1911) (ordering that if parties did not effectuate disintegration of tobacco companies within time allowed, court would appoint receiver to effectuate order); Society for Good Will to Retarded Children, Inv. v. Carey, 466 F. Supp. 722, 727 (E.D.N.Y. Feb. 21,1979) ("In extreme situations, where defendants have failed to respond to court directive, receivers may be appointed…."); Alps South, LLC v. Ohio Willow Wood Company, No. 8:08-cv-1893-T-

3

35MAP, 2013 WL 12161867 at *7-*9 & *11 (M.D. Fl. Nov. 12, 2013) (appointing receiver in patent infringement case to ensure compliance with injunction after continued contemptuous sales by sequestering products in warehouse). Just as in these cases, appointment of a receiver is appropriate in this case to ensure compliance with the Injunction.

Appointment of a receiver is the only reasonable way to ensure compliance with the Injunction. NDG and Fischer-Stuhrling have acted in flagrant disregard of the Injunction and with absolutely no regard for the authority of this Court. Indeed, at the same time NDG was representing to this Court that it had respect for the process, it was purportedly working with Fischer-Stuhrling to continue to sell the Products in a manner concealed from Vertime and the Court. Fischer-Stuhrling claims that it has complied with the injunction; however, Fischer claimed that his company did not keep a record of what it received or what it sold. Therefore, ensuring Fischer-Stuhrling's compliance would be near impossible if the Products were left in its possession.

If the Court appoints a receiver, Vertime (via its designee, DSV[2]) should act as the receiver, to save costs. Vertime requests that the Court order NDG to pay for shipment of the Products to the warehouse of DSV for storage pending further order of the Court. DSV provides logistics services to Vertime. NDG should pay for the costs of the receiver, because it is NDG's violation of the Injunction that created the need for a receivership.

---

[2] "As a global freight forwarder, DSV provides and manages supply chain solutions for thousands of companies every day. Whether you are a small family-run businesses or large global corporation we focus on keeping your supply chains flowing through operational excellence and sustainable growth. This is at the core of our purpose, vision and mission. Our skilled people with industry know-how, modern warehouses, strong carrier relationships and a global network across 80 countries position us to better serve your needs. We help you achieve your business objectives through a unique blend of optimized and flexible solutions, combined with visibility tools, secure IT infrastructure and sustainability. DSV provide optimized transportation and logistics solutions designed by our supply chain experts, ensuring the right balance between costs, $CO_2$ compensation, service levels, lead times and risk. Our global network and strong partnerships provide you with a carrier mix tailored to your needs. We ensure optimization across all modes of transport through the insights of our local experts." Why choose us | DSV

C.  **NDG and Fischer-Stuhrling should be Sanctioned for their Violation of the Injunction.**

"The imposition of civil contempt sanctions may serve dual purposes: to secure future compliance with court orders and to compensate the party that has been wronged." Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 657 (2d Cir. 2004). To the extent a receiver is appointed, sanctions should not be necessary to ensure future compliance with the Injunction. Nevertheless, Vertime has been damaged by NDG's and Fischer-Stuhrling's violations of the Injunction, and therefore, Vertime seeks an award of compensatory sanctions.

1. NDG's and Fischer-Stuhrling's Profits Should be Disgorged

Vertime has been harmed by NDG's and Fischer-Stuhrling's contempt in two ways. First, every sale made in violation of the Injunction was a sale that Vertime was unable to make through its new distributor. Therefore, Vertime requests that the Court enter an order disgorging all of NDG's profits from the date of the Injunction, and Fischer-Stuhrling's profits for any sales made after January 19, 2018. Manhattan Industries, Inc. v. Sweater Bee by Banff, 885 F.2d 1, 5-6 (2d Cir. 1989)(holding that profits are a measure of damages for contempt); GMA Accessories, Inc. v. Eminent, Inc., No. 07-cv-3219 (LTS)(DF), 2008 WL 2355826, at *9-*10 (S.D.N.Y. May 29, 2008) (same). NDG has not disclosed records of its sales of the Products in the relevant time period. Fischer has disclosed that, for the period September 14, 2017 through July 24, 2018, it made sales of Products totaling $1,454,775.27; and remitted $745,800 to NDG. Hearing Exs. S, I. Further, because the burden of proof with regard to expenses that may be deducted from gross revenue to calculate profit is on the contemnor, Manhattan Industries, Inc., 885 F.2d at 7, Vertime requests that the Court enter an order disgorging all sale proceeds remitted to NDG from any source, unless NDG can prove that the specific watches that were sold were not the watches for

5

which it has failed to pay Vertime. For any Products for which NDG failed to pay Vertime, the entire amount received by NDG is profit. At a minimum, the amount remitted to NDG by Fischer - $745,800- should be disgorged; and the proceeds retained by Fischer - $708,975.27- should be disgorged.

2. The Court Should Award Vertime Its Reasonable Attorney's Fees and Costs

Second, Vertime requests that the Court require NDG and Fischer-Stuhrling to jointly and severally reimburse the attorney's fees and costs incurred by Vertime in investigating and litigating NDG's and Fischer-Stuhrling's violations of the Injunction. Vertime requests attorney's fees totaling $141,111.05 and costs of $8,642.68, as detailed in the Declaration of Ann H. Rubin. That Declaration includes the computerized time and cost entries that Vertime requests, as well as detailed descriptions and rate information. Willfulness is not required to impose an attorney's fee sanction; however, it is a factor that weighs heavily in favor of doing so. See Shady Records, Inv. v. Source Enterprises, Inc., 351 F. Supp. 2d 64, 66-68 (S.D.N.Y. 2004). "A willful contempt is one where the contemnor had actual notice of the court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply." GMA Accessories, Inc., 2008 WL 2355826 at *10 (citation and quotation marks omitted).

It cannot reasonably be disputed that NDG willfully violated the Injunction from the moment it was entered, and Fischer-Stuhrling's violation of the Injunction was equally willful (since at least January 2018). Therefore, NDG and Fischer-Stuhrling should be ordered to reimburse Vertime for its attorney's fees and costs incurred investigating NDG's and Fischer-Stuhrling's violations of the Injunction. See id.

Vertime's Attorney's Fees Are Reasonable

Vertime's request for attorney's fees of $141,111.05 is reasonable for this complex and fact-intensive matter that Vertime was forced to litigate for eight years. Vertime successfully obtained an injunction against New Dover Group and Stuhrling-Fischer, and those acting in concert with it, following three days of evidence before this Court. Because NDG and Stuhrling concealed their violations of the injunction, Vertime was forced to investigate the illegal sales, conduct discovery from third parties, and bring this contempt and sanctions proceeding to recover its damages for NDG's and Stuhrling's wrongful conduct. Defendants engaged in lengthy motion practice to avoid much of that discovery, i.e., Dkt. No. 79; ultimately Vertime was able to obtain sufficient discovery to confirm that defendants have been in violation of the injunction from the moment it was entered.

The factors provided in Johnson v. Georgia Highway Exp., Inc., 488 F. 2d 714, 716-19 (5th Cir. 1974) to be considered by the court in a reasonableness determination have been adopted by this Court. Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d 182, 186 n.3 (2d Cir. 2008)(citation omitted) sets forth what factors the Court must consider when resolving what a reasonable client would pay:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Each of those factors support the reasonableness of the fees claimed:

The type of legal services being provided is a key factor in this Court's assessment of the reasonableness of the fees. In this case, this Court is well aware of both the complexity and the specialized nature of this litigation that was conducted over an eight-year period.

The Court is also familiar with the experience, reputation, and results obtained by Vertime's attorneys. These attributes were exhibited in this litigation before this Court, and they have not been challenged by the defendants.

The requested fee award is further supported by additional *Johnson* factors: The novelty and difficulty of the issues; the skill required to perform the services properly; the amounts of money at issue; and the award. The facts and evidence regarding each of these *Johnson* factors is conclusively laid out in the Court's decision in this case.

The hourly rates charged for the work of the various timekeepers who provided services to Vertime over the long life of this matter were reasonable. The Second Circuit has defined a "reasonable hourly rate" as "the rate a paying client would be willing to pay." Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany Cnty. Bd. of Elections, 522 F.3d 182, 190 (2d Cir. 2008). The court may consider numerous factors in determining what that rate is, but must "bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." Id. The invoices attached to this Declaration show what a well-informed and reasonable client was willing to pay.

The fees sought to be recovered by Vertime were actually incurred and paid by a reasonable, seasoned paying client. The party seeking attorneys' fees "bear[s] the burden of documenting the hours reasonably spent by counsel, and the reasonableness of the hourly rates claimed." Beastie Boys v. Monster Energy Co., 112 F. Supp. 3d 31, 48 (S.D.N.Y. 2015) (citations and quotation marks omitted); see also Hensley v. Eckerhart, 461 U.S. 424, 433 (1983) (explaining that the fee applicant must submit "evidence supporting the hours worked and rates

8

claimed"). The presumptively reasonable fee" is "the lodestar"—"the product of a reasonable hourly rate and the reasonable number of hours required by the case." Beastie Boys, 112 F. Supp. 3d at 48 (citations omitted). "Attorney's fees must be reasonable in terms of the circumstances of the particular case ...." Alderman v. Pan Am World Airways, 169 F.3d 99, 102 (2d Cir. 1999). A reasonable hourly rate is based on "the [current] prevailing market rate for lawyers *494 in the district in which the ruling court sits." Anthony v. Franklin First Fin., Ltd., 844 F. Supp. 2d 504, 507 (S.D.N.Y. 2012) (citing Polk v. N.Y. State Dep't of Corr. Servs., 722 F.2d 23, 25 (2d Cir. 1983)); see also McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund, 450 F.3d 91, 96 (2d Cir. 2006) (explaining that a reasonable hourly rate is one in line with rates "prevailing ... in the community for similar services by lawyers of reasonably comparable skill, expertise[,] and reputation." (quoting Blum v. Stenson, 465 U.S. 886, 895 n.11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984))). A "presumptively reasonable fee boils down to what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively." Simmons v. N.Y.C. Transit Auth., 575 F.3d 170, 174 (2d Cir. 2009) (citation and quotation marks omitted).

Awards in similar cases further support the attorney's fees requested by Vertime. The hourly rates charged for this complex case, which range from $585 to $310 per hour for partners and $275 to $225 per hour for associates, have been approved in this District:

- *Museum Bldg. Holdings, LLC v. Schreiber*, 85 Misc. 3d 1274(A) at *4 (N.Y. Sup. Ct. 2025) (observing that "[i]n an assessment of an attorney's fees awarded to prevailing parties in Social Security benefits litigation, an hourly rate of $1,750.00 was recently found reasonable; the court noted that hourly rates of $1,594.59 and $1,918.00 had also been deemed reasonable" and collecting other New York cases finding that $1,000-plus hourly rates were reasonable).
- *Tessemae's LLC v. Atlantis Cap. LLC*, No. 18-CV-4902 (KHP), 2019 WL 2635956, at *4 (S.D.N.Y. June 27, 2019) (collecting

9

- cases supporting reasonableness of "hourly rates ranging from $250 to $1260 per hour[ ] for attorneys' work on a commercial litigation matter").

- *Vista Outdoor Inc. v. Reeves Family Tr.*, No. 16 CIV. 5766, 2018 WL 3104631, at *5–6 (S.D.N.Y. May 24, 2018) (approving rates up to $1,260 for partners at Gibson Dunn because "[t]he rates that Vista paid for their services are similar to those regularly charged to and paid by Gibson Dunn's clients" and "are not excessive in the New York City 'big firm' market").

- *Themis Cap. v. Democratic Rep. of Congo*, No. 09 CIV. 1652 PAE, 2014 WL 4379100, at *7-9 (S.D.N.Y. Sept. 4, 2014) (observing that "partner billing rates in excess of $1000 an hour[ ] are by now not uncommon in the context of complex commercial litigation" and holding that the following rates charged by Dechert LLP were reasonable: $795 - $1000 for partners and $435-$710 for associates).

- *MSC Mediterranean Shipping Co. Holding S.A. v. Forsyth Kownacki LLC*, No. 16 CIV. 8103 (LGS), 2017 WL 1194372, at *3 (S.D.N.Y. Mar. 30, 2017) (finding reasonable the rate of $1,048.47 charged by partners at Gibson Dunn).

- *United States Bank Nat'l Ass'n v. Dexia Real Estate Capital Mkts.*, No. 12 CIV. 9412 (PAE), 2016 WL 6996176, at *8 (S.D.N.Y. Nov. 30, 2016) (approving rates of up to $1,055 per hour).

- *In re Relativity Fashion, LLC*, 565 B.R. 50, 70 (Bankr. S.D.NY 2017) (awarding hourly rates of up to $1,225 for Jones Day partners).

- *Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*, No. 1:17-CV-8987-GHW, 2022 WL 413229, at *14 (S.D.N.Y. Feb. 9, 2022) (approving rates between $405 to $660 for associates and between $712 to $910 for partners in a complex commercial litigation case).

**D.   NDG should be Sanctioned for its False and Misleading Statements.**

NDG repeatedly represented to the Court and Vertime that it was compliant with the injunction, had possession of the Products, and was not selling them. This was untrue, and NDG did not, and still has not, taken any steps to correct its false and misleading statements. Rather, Vertime was forced to incur substantial attorney's fees and expenses to discover the true status of

the Products to protect its rights under the Injunction. Moreover, the harm sought to be prevented by the Injunction continued to occur due to NDG's contempt, which was made possible by its false and misleading statements.

NDG also repeatedly falsely represented to the Court and Vertime that the invoices marked as Hearing Exhibits F, G, and H were created on or very near the dates included on those invoices. NDG's false statements in this regard continued through the Hearing, and were proven false only *after* the Hearing by NDG's severely late production of the QuickBooks Audit Trails.

Friedman also made false statements in his September 12, 2018 Declaration in opposition to the First Motion. He falsely claimed that NDG temporarily ceased sales of the products at issue for thirty days through May 22, 2017. (Hr. Ex. A ¶ 2.) This is proven false by Hearing Exhibit B, which shows the sales NDG made between April 22 and May 22, 2017. He also falsely claimed that NDG didn't sell or otherwise dispose of any products after the Injunction. (Hr. Ex. A ¶ 7; Hr. Tr. at 15-10:16.) This is proven false by Hearing Exhibit C which shows sales on and after June 15, 2017.

This Court has an inherent power to sanction NDG for its improper conduct. Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 336 (2d Cir. 1999). As explained in Chambers v. Nasco, Inc., 501 U.S. 32, 45-46 (1991):

> [A] court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. In this regard, if a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party, as it may when a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order. The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy. (Internal quotation marks omitted.)

11

"Although courts should ordinarily look to specific rules or statutes-such as Rule 11 and Section 1927-to sanction bad-faith conduct, 'if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.'" Homkow v. Musika Records, Inc., No. 04 CIV. 3587 KMW THK, 2009 WL 721732, at *24 (S.D.N.Y. Mar. 18, 2009) (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 50 (1991)).

Vertime was forced to conduct extensive investigation and research to determine the identity of the entity(ies) that were continuing to sell the Products in violation of the Injunction. Once it determined one source (EvergreenCreations), Vertime was forced to depose third-parties (which required significant motion practice) to learn the truth about NDG's continued sales via Fischer-Stuhrling. Further, even after this non-compliance was revealed, Vertime was forced to prosecute the First Motion for more than a year to seek the Court's assistance in forcing compliance with the Injunction. If NDG had informed the Court of its transfer of the Products to Fischer-Stuhrling, instead of making false and misleading statements designed to conceal the transfer, Vertime would not have incurred any of these fees and expenses, and would have been able to promptly secure compliance with the Injunction, to prevent the harm suffered in the market.

Therefore, Vertime requests that the Court impose sanctions on NDG for its false and misleading statements (which have still not been corrected), by awarding Vertime its attorney's fees and costs that were necessitated thereby, and by awarding Vertime damages for the harm caused by NDG's continued sales.

 

                                    **Respectfully submitted,**

Date: December 5, 2025        By: */s/ Ann Rubin*

                                    Ann H. Rubin (*pro hac vice*)
                                    Carmody Torrance Sandak & Hennessey LLP
                                    50 Leavenworth Street
                                    Waterbury, Connecticut  06702
                                    Tel: 203-573-1200
                                    Fax: 203-575-2600
                                    Email: arubin@carmodylaw.com

## CERTIFICATION

      I hereby certify that on the above date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

                                            /s/ Ann H. Rubin (*pro hac vice*)
                                            Ann H. Rubin