**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| VERTIME B.V., | Civil Action No. 7:17-CV-03844(KMK) |
| Plaintiff, | |
| v. | |
| NEW DOVER GROUP, LTD., | |
| Defendant. | |

---

## NEW DOVER GROUP, LTD.'S OPPOSITION TO STATEMENT OF DAMAGES CONCERNING RENEWED MOTION FOR CONTEMPT, SANCTIONS, AND TO APPOINT RECEIVER

**REED SMITH LLP**
599 Lexington Avenue
New York, NY  10022
Tel. (212) 521-5400
Fax (212) 521-5450

*Attorneys for Defendant*
*New Dover Group, Ltd.*

**TABLE OF CONTENTS**

**Page**

ARGUMENT ........................................................................................................... 1

I.    Confiscation of the Products by a Receiver Is Not Warranted ................................. 3

      A.    Vertime Has Not Cited Facts or Law Justifying Appointment of a Receiver ......... 3

      B.    The Record Affirmatively Refutes Receivership as an Option ............................. 5

      C.    Payment of Receivership Expenses is Punitive and Unwarranted ........................ 9

II.   Vertime's Request for Attorneys' Fees Should Be Denied, Or Alternatively Reduced .... 13

      A.    Vertime Cannot Show Willfulness, Precluding a Fee Award ............................... 14

      B.    Vertime's Requested Fees are Excessive and Unreasonable ............................... 17

III.  Vertime's Request for Disgorgement is Improper ........................................... 21

IV.   Vertime Has Not Justified An Award of Sanctions Based on the Court's Inherent
      Authority .............................................................................................. 24

      CONCLUSION ...................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLI Gov't Sec., Inc. v. Rhoades*,
    2000 U.S. Dist. LEXIS 1646 (S.D.N.Y. Feb. 18, 2000)........................................................17

*Boisson v. Am. Pac. Enters., Inc.*,
    1993 U.S. Dist. LEXIS 10768 (S.D.N.Y. Aug. 3, 1993)......................................................14

*Brooks v. Dash*,
    2021 U.S. Dist. LEXIS 3431 (S.D.N.Y. 2021)........................................................................7

*Cancer Res. Inst., Inc. v. Cancer Res. Soc'y, Inc.*,
    744 F.Supp. 526 (S.D.N.Y. 1990) .......................................................................................11

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*,
    2018 U.S. Dist. LEXIS 151961 (S.D.N.Y. Aug. 22, 2018)..................................................22

*City of Almaty v. Mukhtar Ablyazov*,
    2025 U.S. Dist. LEXIS 258832 (S.D.N.Y. Dec. 15, 2025) .............................................19, 20

*Comm'ns Imp. Exp. S.A. v. Republic of the Congo*,
    2021 U.S. Dist. LEXIS 208639 (S.D.N.Y. Oct. 27, 2021) ...................................................21

*Dixon v. Barry*,
    967 F.Supp. 535 (D.D.C. 1997) .........................................................................................4, 5

*Fresh, LLC v. Carioto Produce, Inc.*,
    2022 U.S. Dist. LEXIS 15255 (N.D.N.Y. Jan. 27, 2022) ......................................................6

*Gesualdi v. Bestech Transp., LLC*,
    2022 U.S. Dist. LEXIS 52271 (E.D.N.Y. Mar. 23, 2022)....................................................20

*GMA Accessories, Inc. v. Eminent, Inc.*,
    2008 U.S. Dist. LEXIS 55107 (S.D.N.Y. May 29, 2008).......................................................7

*Great Lakes Educ. Loan Servs., Inc. v. Leary*,
    629 B.R. 360 (S.D.N.Y. 2021)............................................................................................11

*Gucci Am., Inc. v. Lord & Taylor Ecomm LLC*,
    2025 U.S. Dist. LEXIS 205259 (S.D.N.Y. Oct. 17, 2025) ...................................................24

*Gucci Am. v. Bank of China*,
    768 F.3d 122 (2d Cir. 2014)..................................................................................................9

*H&R Block Tax Servs., LLC v. Strauss*,
 2015 U.S. Dist. LEXIS 87668 (N.D.N.Y. July 7, 2015) ..................................................19

*Idaho Potato Comm'n v. Majestic Produce Corp.*,
 1998 U.S. Dist. LEXIS 16347 (E.D.N.Y. Sept. 9, 1998) ..............................................16

*Ime Watchdog, Inc. v. Gelardi*,
 2024 U.S. Dist. LEXIS 173763 (E.D.N.Y. Sept. 25, 2024) .....................................10, 17

*Ime Watchdog, Inc. v. Gelardi*,
 2025 U.S. Dist. LEXIS 156816 (E.D.N.Y. Aug. 13, 2025) ...........................................12

*Int'l Union, UMW v. Bagwell*,
 512 U.S. 821 (1994) ...............................................................................................9, 11, 12

*JLM Couture, Inc. v. Gutman*,
 2022 U.S. Dist. LEXIS 232881 (S.D.N.Y. Dec. 21, 2022) ............................................17

*In re Kalpana Electronics, Inc.*,
 58 B.R. 326 (Bankr. E.D.N.Y. 1986) ............................................................................10

*King v. Allied Vision*,
 919 F.Supp. 747 (S.D.N.Y. 1996) .................................................................................14

*King v. Allied Vision, Ltd.*,
 65 F.3d 1051 (2d Cir. 1995) ..........................................................................................14

*Manhattan Indus. v. Sweater Bee by Banff, Ltd.*,
 885 F.2d 1 (2d Cir. 1989) ...........................................................................10, 14, 16, 21

*Markus v. Rozhkov*,
 615 B.R. 679 (S.D.N.Y. 2020) ...................................................................................9, 11

*Mazzei v. Money Store*,
 2023 U.S. App. LEXIS 27213 (2d Cir. Oct. 13, 2023) ..................................................24

*Meehan v. Gristede's Supermarkets, Inc.*,
 2004 U.S. Dist. LEXIS 31805 (E.D.N.Y. Aug. 4, 2004) ..............................................17

*Morgan v. McDonough*,
 540 F.2d 527 (1st Cir. 1976) ........................................................................................4, 5

*N.Y. v. Operation Rescue Nat'l*,
 80 F.3d 64 (2d Cir. 1996) ..............................................................................................11

*N.Y. Wheel Owner LLC v. Mammoet*,
 2021 U.S. Dist. LEXIS 121098 (S.D.N.Y. June 29, 2021) ...........................................24

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*,
  369 F.3d 645 (2d Cir. 2004).................................................................................12, 20

*Paramount Pictures Corp. v. Carol Publ'g Grp.*,
  25 F.Supp.2d 372 (S.D.N.Y. 1998) ....................................................................7

*Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc.*,
  277 F.Supp.2d 323 (S.D.N.Y. 2003)...................................................................18

*Society for Good Will to Retarded Children, Inv. v. Carey*,
  466 F.Supp. 722 (E.D.N.Y. 1979) .......................................................................4

*U.S. v. American Tobacco Co.*,
  221 U.S. 106 (1911)............................................................................................4

*U2 Home Entm't, Inc. v. Hong Wei Int'l Trading, Inc.*,
  2005 U.S. Dist. LEXIS 14790 (S.D.N.Y. Mar 3, 2005) .....................................9

*Uniformed Fire Officers Ass'n v. De Blasio*,
  973 F.3d 41 (2d Cir. 2020)..............................................................................1, 21

*Vuitton et Fils S.A. v. Carousel Handbags*,
  592 F.2d 126 (2d Cir. 1979)................................................................................14

*W.E. Bassett Co. v. Revlon, Inc.*,
  435 F.2d 656 (2d Cir. 1970)................................................................................16

*Williams v. City of New York*,
  2017 U.S. Dist. LEXIS 70929 (S.D.N.Y. May 9, 2017).....................................21

*Yimby, Inc. v. Fedak*,
  2017 U.S. Dist. LEXIS 96700 (S.D.N.Y. June 22, 2017)...................................12

*Zino Davidoff SA v. CVS Corp.*,
  2008 U.S. Dist. LEXIS 36548 (S.D.N.Y. Apr. 17, 2008)...................................14

Defendant and respondent New Dover Group, Ltd. ("NDG"), by and through its undersigned counsel, respectfully submits this memorandum of law in opposition to plaintiff Vertime B.V.'s ("Vertime") Submission in Support of its Claim for Damages for Contempt filed December 5, 2025 ("Statement of Damages"), together with the Declaration of Samuel Friedmann submitted herewith ("Friedmann Dec."), in connection with Vertime's third motion for contempt, sanctions, and to appoint a receiver (the "Motion") related to this Court's June 15, 2017 preliminary injunction (the "Injunction").[1]

## ARGUMENT

As a threshold matter, NDG repeats and reasserts its arguments that Vertime's request for contempt should be denied on its merits. Because much of Vertime's Statement of Damages rehashes the merits of contempt, NDG briefly responds before turning to the question of remedies.

NDG did not violate the Injunction. Even assuming relief could lie against the defunct NDG, there are at most two relevant acts by NDG at issue: (1) NDG's sale of certain Ferragamo, Versace, and Versus watches (the "Products") to Fischer-Stuhrling, and (2) NDG's physical transfer of the Products to Fischer-Stuhrling after the sale (the "Move"). The sale could not have violated the Injunction, because it took place before the Injunction was entered, and no TRO or other order was in place forbidding the sale. A party cannot be held in contempt for violating an order that was not yet in place. *Uniformed Fire Officers Ass'n v. De Blasio*, 973 F.3d 41, 48 (2d Cir. 2020) ("Nor does an injunction reach backwards in time to action taken prior to the time it

---

[1] The Statement of Damages consistently refers to NDG together with Chaim Fischer, Stuhrling Original, LLC, and Stuhrling Outlet (collectively, "Fischer-Stuhrling") as "defendants." This is a material mischaracterization. Fischer-Stuhrling are not defendants, and incorrectly labeling them as such elides that Fischer-Stuhrling was not named in the Injunction or bound by it until the Injunction was modified in 2018, such that Vertime must prove the heightened showing that Fischer-Stuhrling "acted in concert with" NDG in order to subject Fischer-Stuhrling to contempt or impute its actions to NDG.

was issued.").  The Move also could not have violated the Injunction: even were Vertime able to prove that it took place after the Injunction was entered, the Injunction did not forbid the transfer of watches, only their sale (*see* Dkt. 36), which had already been effected.  Thus, neither the sale nor the Move can be contemptuous.  Vertime has failed to prove by clear and convincing evidence that NDG committed any other potentially-contemptuous act, *i.e.* showing that NDG sold Products post-Injunction, or showing that sales by Fischer-Stuhrling are legally imputable to NDG somehow.

Vertime cannot get around these points.  Its attacks on matters like NDG's good faith, Mr. Friedmann's credibility, or NDG's discovery compliance, do not address the dispositive question: has Vertime proven by clear and convincing evidence that NDG <u>sold</u> Products <u>after</u> the Injunction was entered?  Vertime has failed in carrying that burden.

Nevertheless, at the November 13, 2025 conference, the Court directed Vertime to make a filing substantiating its alleged damages.  Thus, although the Statement of Damages relitigates the merits despite that instruction and NDG continues to dispute that any finding of contempt is proper, this submission focuses on the remedies that Vertime seeks to obtain if contempt were found.

Vertime has failed to justify any of the relief it seeks.  Each remedy is discussed below, and in each case Vertime has failed to show that the desired relief is available as a threshold matter and/or that it is appropriate on these facts.  Three critical points apply to each of Vertime's arguments.  **<u>First</u>**, the alleged contempt before the Court is a single event that happened in 2017 and has never recurred.  **<u>Second</u>**, despite the Court's express direction to detail its losses, Vertime's submission largely repeats its merits brief and, other than attaching billing information for attorneys' fees, does not substantiate any expenses or out-of-pocket losses caused by NDG's supposed contempt.  **<u>Third</u>**, Mr. Friedmann has emphasized that NDG understood itself to be

- 2 -

acting within its legal rights and did not intend any disrespect to the Court. Despite Vertime's attacks, it has failed to establish that NDG acted out of deliberate bad faith.

## I.    Confiscation of the Products by a Receiver Is Not Warranted

Vertime first requests the appointment of a receiver "to ensure compliance with the Injunction," by taking possession of the Products and holding them for storage. Dkt. 198 at 3-4.[2] This is a drastic remedy, and Vertime does not establish that it is available or appropriate here. As Vertime's own cases demonstrate, receivership is a last resort for situations where court orders have repeatedly been defied; here, the only act of contempt that has been even colorably alleged was a one-off event that occurred years ago, without repetition.

### A.    Vertime Has Not Cited Facts or Law Justifying Appointment of a Receiver

The Court directed Vertime to detail the damages it believes it has suffered as a result of alleged contempt, but the Statement of Damages does not do so. Regarding receivership, the Statement of Damages simply copies Vertime's moving brief, nearly word for word, and does not add any substantive content. *Compare* Dkt. 198 at 3-4 *with* Dkt. 183 at 19-20. In particular, it does not provide additional factual detail on losses that Vertime has suffered that might justify the specific and extraordinary remedy of receivership.

Compounding this deficiency, Vertime cited (and cites now again) no legal authority supporting the conclusion that a receiver is warranted <u>here</u>. The cases cited by Vertime stand only for the principle that appointment of a receiver may sometimes be an available remedy, in certain cases. *See* Dkt. 198 at 3-4. That is not in dispute: the question is whether receivership is

---

[2] Vertime now suggests logistics company DSV as the proposed receiver (Dkt. 198 at 4), but its moving brief suggested a company named Geodis (Dkt. 183 at 20). The reason for the change is not addressed.

appropriate on the facts of <u>this</u> case, where an allegedly contemptuous movement of watches from NDG to Fischer-Stuhrling happened over eight years ago, without further incident since then.

Indeed, Vertime's cited cases further confirm that receivership is not appropriate. Vertime particularly emphasizes *Morgan v. McDonough*, 540 F.2d 527 (1st Cir. 1976), which held that receivership was appropriate (1) <u>after</u> "more usual remedies" of "contempt proceedings and further injunctions" had failed to curb ongoing and systematic violations, *id.* at 533, (2) in the specific context of desegregating a public school. Here, there is nothing like the record of systematic violation that was a precondition to receivership in *Morgan*; nor are the facts of this case anything like the fraught context of school desegregation. Similarly, in *Dixon v. Barry*, 967 F.Supp. 535 (D.D.C. 1997), the district court appointed a receiver to take control of the District of Columbia's Commission on Mental Health Services, after more than 20 years of litigation during which local officials repeatedly refused to comply with court orders and consent decrees. In *Society for Good Will to Retarded Children, Inv. v. Carey*, 466 F.Supp. 722 (E.D.N.Y. 1979)—Vertime's only authority on receivership from this Circuit—the decision concerned disqualification of an attorney based on his membership on a panel overseeing a consent decree governing state facilities for the mentally handicapped. Finally, in *U.S. v. American Tobacco Co.*, 221 U.S. 106 (1911), a venerable case regarding antitrust regulation of the tobacco industry, the Supreme Court expressly chose <u>not</u> to appoint a receiver, merely noting that this would be one remedial consequence if the monopoly at issue were not promptly broken up. *Id.* at 186-88. In sum, Vertime's cases are nothing like this one, and do not support receivership here.

Moreover, these cases emphasize limitations on the role of a receiver that Vertime disregards. For instance, *Morgan* stressed that receivership "is an extraordinary step warranted only by the most compelling circumstances . . . [which] should last no longer than the conditions

which justify it make necessary, and . . . must not go beyond the constitutional purposes which the device is designed to promote." 540 F.2d at 535. *Dixon* noted that appointment of a receiver is a last resort: the key question is "whether any other remedy is likely to be successful" such that "receivership is really the only remedy left[.]" 967 F.Supp. at 550.

Thus, Vertime has not submitted facts, or cited on-point authority, supporting the appointment of a receiver in this particular case. Vertime's authorities establish only that a receiver can sometimes be an appropriate remedy in truly extraordinary cases, as a last resort after lengthy and extreme records of noncompliance that are not present here.

## B.    The Record Affirmatively Refutes Receivership as an Option

In fact, the record actively undermines Vertime's request for a receiver. Any contempt committed in this case would be an isolated event that has not recurred in many intervening years; Vertime has failed to show repeated post-Injunction violations. Since receivership is reserved for patterns of persistent violation, it is not appropriate here.

Vertime's primary theory of contempt as to NDG is that the Move occurred after the Injunction was entered on June 15, 2017. *See*, *e.g.*, Dkt. 183 at 2 (Vertime's moving brief, incorrectly contending that "all of the evidence . . . shows that the Move occur *after* the Injunction entered." [sic]).[3] NDG's sale to Fischer-Stuhrling, and the associated Move, was a one-off event:

---

[3] NDG continues to dispute Vertime's incorrect and misleading characterization of events. First, Vertime simply ignores the substantial direct evidence that the Move occurred on June 13 and 14, 2017. Even if one sets aside Mr. Friedmann's repeated sworn testimony (Dkt. 123 at ¶ 5, Hearing Tr. at 55:14-62:12, Dkt. 189 at ¶¶ 13-20), which Mr. Fischer does not dispute (Dkt. 186-1 at 37:17-22), the available documentary evidence shows the Move occurring pre-Injunction. *See*, *e.g.*, Dkt. 102-1 (copies of invoices #191089096, 191092814, and 191093015, dated June 13 and 14, 2017); Dkt. 151-1 (handwritten contemporaneous documentation of the Products' receipt, located by Fischer-Stuhrling, consistent with Mr. Friedmann's description at Hearing Tr. 72:3-23). Vertime has no direct evidence that the Move took place after the Injunction. It only attempts to recharacterize or impeach NDG's evidence, *e.g.* pressing the fallacious argument that, because the invoices were finalized post-Injunction, the transfer they record must have taken place post-

Vertime has not come close to showing by clear and convincing evidence that any other sales by NDG took place after the Injunction. *See id.* at 17-18 (Vertime's moving brief, outlining its theory of NDG's actions that were supposedly contemptuous). At most, Vertime has made the conclusory statement that Exhibit C from the March 5, 2019 contempt hearing shows post-Injunction sales (Dkt. 183 at 23), but this is false, as was explained at that hearing: Exhibit C shows <u>charges</u>, not <u>sales</u> (and is clearly labeled as such), related to First SBF Holding Inc. and not NDG. *See* Friedmann Dec. ¶ 16. There is no evidence whatsoever of post-Injunction sales by NDG.

Vertime has attempted, but failed, in its theory that NDG is liable for post-Injunction sales by Fischer-Stuhrling. It is not in dispute that, for a time after buying the Products from NDG, Fischer-Stuhrling sold Products valued at $1,454,775.27, and remitted $745,800 to First SBF Holding Inc. (another company affiliated with NDG) between October 2017 and March 2018, as payment towards the June 11 sale agreement. *See* Hearing Tr. at 170:25-171:16; Dkt. 193-1 at 300 (Exhibit I to Mar. 5, 2019 Hearing). However, Fischer-Stuhrling is not a party, and was not named in the Injunction. *See* Dkt. 36. The Injunction cannot "enjoin the world at large[,]" and thus Fischer-Stuhrling was an unbound third party, free to re-sell the Products it had bought from NDG until the Injunction was extended on July 24, 2018. *CF Fresh, LLC v. Carioto Produce, Inc.*, 2022 U.S. Dist. LEXIS 15255, at *10 (N.D.N.Y. Jan. 27, 2022). Vertime has not shown that NDG and Fischer-Stuhrling satisfy the demanding standard for "acting in concert with" one another for purposes of Rule 65, *i.e.* that NDG "controlled and used" Fischer-Stuhrling as an "instrumentality"

---

Injunction as well (Dkt. 183 at 1); or casting doubt on points of Mr. Friedmann's testimony, which he has explained (Dkt. 188 at 17).

Second, even if Vertime could show that the Move took place post-Injunction, the Move would not be contemptuous as a matter of law, as the Injunction only bars the <u>sale</u> of the Products, not their movement or transfer. *See* Dkt. 36.

or that the companies are "substantially intertwined" with one another. *GMA Accessories, Inc. v. Eminent, Inc.*, 2008 U.S. Dist. LEXIS 55107, at *41-49 (S.D.N.Y. May 29, 2008); *Paramount Pictures Corp. v. Carol Publ'g Grp.*, 25 F.Supp.2d 372 (S.D.N.Y. 1998). Nor has Vertime made any other showing that might impute Fischer-Stuhrling's independent sales to NDG.

Vertime's lack of evidence on the supposed collaboration between NDG and Fischer-Stuhrling is particularly glaring. For instance, Vertime's moving brief simply asserts that "common sense" must mean that Fischer knew about "Friedmann's/NDG's troubles" (presumably meaning the Injunction) at the time of the sale, because Fischer is Friedmann's brother-in-law and has done business with him. Dkt. 183 at 18. An appeal to "common sense" is not an argument. The unrebutted testimony of both Friedmann and Fischer is that Fischer-Stuhrling was not told about the impending Injunction at the time of the sale (Hearing Tr. 78:15-20, 177:9-16), and did not learn about the Injunction until months later in January 2018 (*id.* at 169:8-11). Vertime cannot simply gesture at the existence of a relationship between Friedmann and Fischer as individuals, and claim that satisfies the demanding standard for their companies "acting in concert" to circumvent the Injunction. *See Brooks v. Dash*, 2021 U.S. Dist. LEXIS 3431, at *4 (S.D.N.Y. 2021) ("Brooks seems to assume that because [non-party] Horn is a member of Poppington, her actions could be imputed both to [defendant] Dash, the other member of Poppington, and to Poppington itself. Brooks, however, offers no support for this proposition, and the Court will not find either defendant in contempt for the actions of Horn."). It is also insufficient that First SBF Holding received $745,800 from Fischer-Stuhrling. Friedmann Dec. ¶ 9. The Injunction does not prohibit receipt of funds, and that entity's passive acceptance of payment subsequent to the June 11, 2017 sale does nothing to show post-Injunction sales by NDG.

To summarize: (1) there is no claim that NDG itself sold Products post-Injunction, other than Vertime's allegation that the one-off Move to Fischer-Stuhrling was contemptuous; and (2) Vertime has fallen far short of showing that subsequent sales by Fischer-Stuhrling in 2017 and 2018 should be imputed to NDG, under the "active concert" theory or otherwise. Therefore, even were NDG found to have committed contempt in the Move, there is no evidence whatsoever of any repeat or ongoing violation. Moreover, Vertime has not even alleged that Fischer-Stuhrling sold any Products after becoming bound by the Injunction on July 24, 2018. *Compare* Dkt. 185 at 7-8 (Fischer-Stuhrling's opposition brief, noting that "[i]t is also undisputed that no sales have occurred since that date.") *with* Dkt. 190 at 3-6 (Vertime's reply to Fischer-Stuhrling's opposition, which does not dispute this or offer proof of later sales). All evidence is that Fischer-Stuhrling has simply held the remaining watches in its possession without incident for years.

Therefore, there is no repeat or ongoing violation, either now or in the past, and therefore no basis for the drastic remedy of receivership. Even if *arguendo* Vertime showed that the Move took place post-Injunction and was contemptuous, that would mean one contemptuous act at issue, which took place in 2017. Vertime's own cases confirm this does not justify receivership.

Seen in the totality of the circumstances, Vertime's request for receivership is severe overreach. NDG bought the Products from Vertime and third parties before the parties' relationship ended, and paid Vertime for them. Vertime does not claim to own the Products, having sold them to NDG: its own operative pleading admits that Vertime must "**re**purchase" the Products to get them back. Dkt. 28 at 8 (Prayer for Relief, 1(b)(iv)). And Vertime notably avoids any discussion of other means by which it has been already compensated, such as through insurance. Friedmann Dec. ¶ 15. Yet now Vertime asks the Court to order that the Products be confiscated and held indefinitely by its own designee, at NDG's and Fischer-Stuhrling's expense. This would all but

give Vertime the ultimate relief it is seeking in this action; and it would effectively give Vertime a triple recovery by handing over to its designee, for free, Products that belong to NDG and Fischer-Stuhrling which Vertime was paid for, would otherwise be obligated to repurchase, and has likely been compensated for by insurance. Vertime seeks this burdensome, intrusive, and unusual remedy despite being unable to show that any contemptuous act has occurred in many years, if ever. That is a fundamentally inappropriate request.

### C. Payment of Receivership Expenses is Punitive and Unwarranted

Vertime also asks that the respondents pay (1) the cost of shipping the Products to a receiver's warehouse for storage, and (2) paying all costs of the receiver. Even were this Court to appoint a receiver, payment of these unfixed and indefinite costs would be inappropriate.

As noted *supra*, "a civil contempt sanction must only be compensatory or coercive, and may not be punitive." *Gucci Am. v. Bank of China*, 768 F.3d 122, 144 (2d Cir. 2014). "A sanction is considered civil and remedial if it either coerces the defendant into compliance with the court's order, or . . . compensates the complainant for losses sustained. Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge." *Markus v. Rozhkov*, 615 B.R. 679, 713 (S.D.N.Y. 2020) (quoting *Int'l Union, UMW v. Bagwell*, 512 U.S. 821, 829 (1994)). Here, the costs Vertime seeks are neither compensatory or coercive, but improperly punitive in nature: they amount to a fine, seeking to punish respondents for at most a single act of allegedly-contemptuous past behavior.

First, these costs are not compensatory: they go toward future costs that have not yet been incurred, rather than compensating Vertime for an existing loss. Evidence of out-of-pocket loss is required for compensatory contempt sanctions. *See U2 Home Entm't, Inc. v. Hong Wei Int'l Trading, Inc.*, 2005 U.S. Dist. LEXIS 14790, at *21-22 (S.D.N.Y. Mar 3, 2005) (for compensatory

sanctions, "proof of loss must be present"); *In re Kalpana Electronics, Inc.*, 58 B.R. 326, 338 (Bankr. E.D.N.Y. 1986) ("Compensatory damages for civil contempt may be awarded based on evidence of actual loss.").[4]  Despite this, nothing in Vertime's Statement of Damages—particularly not the section on this topic—establishes specific out-of-pocket losses derived from a specific act of contempt by either respondent.  At most, Vertime simply asserts elsewhere in its submission that "every sale made in violation of the Injunction was a sale that Vertime was unable to make[,]" adding the dollar amount of Fischer-Stuhrling's sales.  Dkt. 198 at 5-6.  Other than this conclusory and unsupported statement, Vertime once again repeats its merits brief nearly verbatim, and does not provide further explanation or detail as to how it has suffered out-of-pocket loss.  *Compare id. with* Dkt. 183 at 21-22.

Because Vertime "does not identify any actual losses it suffered due to [respondents' allegedly] contemptuous conduct apart from attorneys' fees and costs[,]" any argument for compensatory relief should be considered abandoned.  *Ime Watchdog, Inc. v. Gelardi*, 2024 U.S. Dist. LEXIS 173763, at *10 (E.D.N.Y. Sept. 25, 2024).  Even if Vertime has not outright abandoned an argument for actual losses, it has certainly failed to carry its burden to demonstrate them.[5]  Since Vertime cannot show actual losses, payment of receivership costs is not a compensatory remedy.

---

[4] To be sure, an alternative exists: where out-of-pocket pecuniary losses cannot be demonstrated, a contempt movant <u>may</u> be entitled to a contemnor's profits under an unjust enrichment theory, "as a substitute for legal damages."  *See Sweater Bee*, 885 F.2d at 5-6.  The defects in Vertime's request that respondents disgorge their alleged profits are dealt with below in Section III.  Here, it suffices to note that this principle (1) is still compensatory in conception, and thus does not displace the broader rule that compensatory contempt sanctions must aim to cure a demonstrated injury, which Vertime here has not shown; and (2) is inapplicable to the matter of receivership costs, since forcing respondents to pay such costs has no connection to recovering 'profits.'

[5] Vertime also cannot argue that compelling respondents to pay for the desired receivership is a compensatory remedy on the theory that it makes Vertime whole for the costs of receivership.  The costs of receivership are not only a future expense, rather than actual out-of-pocket loss; they are also not fairly traceable to any contemptuous conduct by respondents.  Receivership is only at issue because Vertime chooses to seek it, not because it is <u>necessary</u> relief for any alleged contempt.

*Great Lakes Educ. Loan Servs., Inc. v. Leary*, 629 B.R. 360, 370 (S.D.N.Y. 2021) ("Because the challenged sanction did not remediate actual damages caused by Great Lakes' contumacy, it was not compensatory.").

Second, compelling respondents to pay the receivership's costs would not coerce compliance. Most importantly, respondents are already in compliance: as discussed above, Vertime has not shown that either NDG or Fischer-Stuhrling sold Products in violation of the Injunction after the Move. Even if contempt occurred here, it was an isolated event that has not occurred again since 2017. "When a contempt involves the prior conduct of an isolated, prohibited act, the resulting sanction has no coercive effect." *Int'l Union v. Bagwell*, 512 U.S. 821, 829 (1994). There is certainly no argument that violations of the Injunction are occurring now, such that respondents need to be "brought into" compliance. *See Cancer Res. Inst., Inc. v. Cancer Res. Soc'y, Inc.*, 744 F.Supp. 526, 530 (S.D.N.Y. 1990) (coercive remedy not appropriate where "[t]he record does not reveal that defendant continues to violate the injunction. Although its compliance was late, its exhibits display current compliance.").

Further, under Vertime's proposal, the respondents would have no opportunity to purge. Vertime does not suggest any scenario whereby respondents could avoid paying the receivership costs by acting in compliance with the Injunction. A sanction that does not provide an opportunity to purge is not coercive. *Great Lakes*, 629 B.R. at 371; *Markus*, 615 B.R. at 713.[6]

Since Vertime's proposal for receivership costs is neither compensatory nor coercive, it is not a proper remedy for civil contempt. *N.Y. v. Operation Rescue Nat'l*, 80 F.3d 64, 68 n.7 (2d Cir. 1996) ("[A] noncompensatory fine is civil, and thus may ordinarily be imposed in the absence of

---

[6] In fact, purging would be literally impossible: respondents are currently in compliance with the Injunction, and could not somehow further demonstrate compliance (by refusing to sell the Products) if a receiver takes the Products away from them.

a criminal trial 'only if the contemnor is afforded an opportunity to purge.'") (quoting *Bagwell*, 512 U.S. at 829); *Yimby, Inc. v. Fedak*, 2017 U.S. Dist. LEXIS 96700, at *16-17 (S.D.N.Y. June 22, 2017) ("the requests are designed neither to coerce compliance, nor compensate Movants . . . The Court therefore declines to award those requests."). This is dispositive: since receivership costs are neither compensatory nor coercive in nature, they may not be awarded as a civil contempt remedy. However, two other points bear noting, as they further confirm the meritlessness of Vertime's request.

First, Vertime is seeking a blank check. Vertime does not put forward any details regarding costs, *e.g.* total estimated costs, estimated rates, and/or a proposed cap on expenses. Rather, Vertime seeks an open-ended obligation for respondents to pay the costs of receivership indefinitely. This case has already been pending for over eight years; it is unclear how much longer it might go on before an eventual trial and judgment provided final adjudication and an end to the receivership.

Second, it is relevant that NDG lacks the financial resources to pay such a sanction. *See Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 658 (2d Cir. 2004) ("A contemnor may be excused from the burden of a civil contempt sanction if it lacks the financial capacity to comply . . ."); *Ime Watchdog, Inc. v. Gelardi*, 2025 U.S. Dist. LEXIS 156816, at *7-9 (E.D.N.Y. Aug. 13, 2025) (declining to impose monetary sanctions given Defendants' demonstrated lack of resources, noting "the expression 'you cannot squeeze blood from a turnip' comes to mind in this case."). As Mr. Friedmann has explained, NDG has had no employees since November 2018, and has not transacted any business since December 11, 2020. Dkt. 189 ¶ 7; *see also* Friedmann Dec. ¶ 11. It does not have any premises, accounts, or assets, other than what remains of its legal interest in the watches at issue in this case. *Ibid.* Confirming

- 12 -

the point, NDG has been through Chapter 7 liquidation proceedings, and the Trustee in that case identified only three assets: NDG's arbitral counterclaims against Vertime (which were bought by Vertime), watches worth $983,395.50 (which were auctioned by M&T Bank), and a checking account holding $988.79.  Dkt. 189 ¶ 8.

Vertime cannot contradict the evidence that NDG lacks assets.  Its only response has been to posit that NDG has an abstract claim against Fischer-Stuhrling for the remaining payments owed for the Products.  *See* Dkt. 190 at 7.  While it is undisputed that Fischer-Stuhrling did not remit the full amount due for the Products, that is an insubstantial rebuttal.  A hypothetical future claim does not outweigh the fact that NDG has no employees, no assets, no meaningful existence, and no prospect of being revived to pursue this claim.  Imposing monetary sanctions that NDG cannot pay serves no useful purpose.

In sum, Vertime's demand for respondents to pay the costs of receivership is not a proper civil remedy: it is nakedly punitive, in intent and in effect.  It does not compensate any demonstrated out-of-pocket loss, nor coerce compliance with the Injunction, which is already the status quo.  Instead, Vertime is transparently seeking to increase pressure on the respondents, and make their alleged contempt sting.  That is punitive, and the request is improper.

## II.    **Vertime's Request for Attorneys' Fees Should Be Denied, Or Alternatively Reduced**

Vertime's request for attorneys' fees and costs is improper on two levels.  First, any contempt by NDG does not meet the Second Circuit's standards for an award of attorneys' fees; on this basis, the request should be denied in its entirety.  Second, in the alternative—if the Court finds that an award of attorneys' fees is merited—the proposed award of $149,753.73 is excessive and unreasonable, and should be reduced.

- 13 -

## A.    Vertime Cannot Show Willfulness, Precluding a Fee Award

The dominant weight of authority holds that an award of attorneys' fees in connection with civil contempt requires a finding of willfulness.  Because the record does not establish that NDG acted willfully, fees should not be awarded.

"[C]ourts in this Circuit generally award the reasonable costs of prosecuting the contempt, including attorneys' fees, only where violation of a court order is found to have been willful." *Manhattan Indus. v. Sweater Bee*, 885 F.2d 1, 8 (2d Cir. 1989) (citations and internal punctuation omitted); *Zino Davidoff SA v. CVS Corp.*, 2008 U.S. Dist. LEXIS 36548, at *21-22 (S.D.N.Y. Apr. 17, 2008) (stating that "the overwhelming majority of courts in this Circuit strictly adhere to the general practice" that willful violation must be found before attorneys' fees will be awarded).[7]  The movant bears the burden to establish willfulness.  *King v. Allied Vision*, 919 F.Supp. 747, 752 (S.D.N.Y. 1996).  Willfulness exists where a contemnor is aware of the order, is able to comply, does not act in good faith to do so, and does not seek to modify the order.  *Id.* at 752-53 (collecting cases).

Vertime has failed to show willfulness.  On this subject, too, Vertime's Statement of Damages repeats its moving brief near-verbatim and adds nothing of substance.  *Compare* Dkt.

---

[7] It is true that the Second Circuit has declined to formally hold that a finding of willfulness is always required before fees may be awarded.  Nevertheless, beyond the general rule stated in *Sweater Bee*, the Second Circuit has endorsed willfulness as a precondition to a fee award on other occasions.  *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1063 (2d Cir. 1995) ("in order to award fees, the district court had to find that . . . contempt was willful."); *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979) ("it is appropriate for the court also to award the reasonable costs of prosecuting the contempt, including attorney's fees, if the violation . . . is found to have been willful.").  Further, the weight of authority at the district court level is clear.  *See Zino Davidoff*, 2008 U.S. Dist. LEXIS 36548, at *21-22; *Boisson v. Am. Pac. Enters., Inc.*, 1993 U.S. Dist. LEXIS 10768, at *6 (S.D.N.Y. Aug. 3, 1993) ("In this Circuit, attorney's fees are awarded only where the contempt was willful.") (citing *Sweater Bee*).  Consequently, Vertime's unqualified statement that "[w]illfulness is not required" for a fee award, without noting contrary authority, mischaracterizes the law.  Dkt. 198 at 6.

198 at 6 *with* Dkt. 183 at 22. Specifically, after citing the relevant standard, Vertime devotes a single conclusory sentence to the assertion that NDG's conduct here was willful, simply stating that "[i]t cannot reasonably be disputed that NDG willfully violated the Injunction from the moment it was entered, and Fischer-Stuhrling's violation of the Injunction was equally willful (since at least January 2018)." Vertime makes no serious effort to explain how specific actions by NDG meet the standard for willfulness, and therefore has not carried its burden.

In fact, the record affirmatively establishes that NDG did <u>not</u> act willfully, and was in fact acting in good faith in a manner it understood to be consistent with the Injunction. Mr. Friedmann, as NDG's former principal, testified that he believed he was acting within his legal rights in carrying out NDG's sale of the Products to Fischer-Stuhrling; "had no intention of violating a court order" and understood the sale to be lawful; and "did not (and do not) intend any disrespect to the Court." Dkt. 189 ¶ 15. Consideration of the record facts, as opposed to Vertime's vague accusations that NDG violated the Injunction "from the moment it was entered," demonstrates the reasonableness and credibility of NDG's position.

Mr. Friedmann is not a lawyer. He consulted with counsel regarding the sale, however. *Id.* Prior to the Injunction, NDG did not conceal that it was making general efforts to sell the Products. *See* Dkt. 124-1 at 1 (excerpt from Yiddy Werzberger's testimony at June 2017 contempt hearing, stating that NDG was actively selling Products). Indeed, NDG told Vertime about the sale of the Products, both before and after it occurred. Hearing Tr. 50:23-52:1. Nevertheless, Vertime did not seek a temporary restraining order that, if granted, would have barred NDG from selling the Products prior to the entry of the Injunction. *See* Dkt. 11. Thus, it was fully reasonable for NDG to understand itself to be free to sell the Products as of June 11, 2017, because it was: no prohibitive order was yet in place. On that date, NDG sold the Products to Fischer-Stuhrling via a handshake

deal between Friedmann and Fischer.  Hearing Tr. 139:24-140:7; 183:25-184:25.  Vertime's efforts to challenge the facts of that transaction are meritless: Friedmann and Fischer agree on what took place, and there is documentary proof of the event at which it happened.  *Ibid.*; *see also* Dkt. 151 (enclosing *sheva brachos* invitation).  NDG has not sold any Products since the June 11, 2017 sale.  Friedmann Dec. ¶ 4.  Vertime has not shown otherwise; its only attempt has been a conclusory argument based on a misreading of Hearing Exhibit C.  *Id.* ¶ 16.  The Move also took place pre-Injunction; but even if the Court finds that it took place post-Injunction as Vertime has argued, the Move (1) was a necessary incident to the already-consummated, pre-Injunction sale, not a new post-Injunction transaction, and (2) did not violate the Injunction, whose language prohibited only the <u>sale</u> of the Products.

In sum, even if this Court concludes that NDG was not honoring the spirit of the Injunction—which NDG respectfully disputes—the record shows that NDG intentionally followed the <u>letter</u> of the Injunction.  This is a far cry from the type of "callous indifference" that supports willfulness.  *Idaho Potato Comm'n v. Majestic Produce Corp.*, 1998 U.S. Dist. LEXIS 16347, at *17-18 (E.D.N.Y. Sept. 9, 1998).  *Sweater Bee* also provides an illustrative contrast: there, the Court of Appeals declined to award attorney's fees, despite significantly more egregious facts than those at issue here.  The contemnor had committed "sustained and material violations" that "demonstrated a callous disregard for the rights of [movant] and for the mandates of the federal courts[.]"  885 F.2d at 5, 8 (quoting *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 664 (2d Cir. 1970)).  But despite that record of contumacy, a special master and the district court both found that the contemnor had not acted willfully, which the Court of Appeals accepted, rejecting a fee award.

Even if NDG's conduct merits censure, or even rises to the level of contempt, Vertime has not shown that NDG acted willfully. Per the strong weight of authority, that lack of willfulness defeats Vertime's request for attorneys' fees.

### B.    Vertime's Requested Fees are Excessive and Unreasonable

Further, the fees Vertime seeks exceed what is reasonable or appropriate, because they go far beyond the scope of this motion. Vertime's request for $149,753.73 in fees and costs should be reduced to a reasonable figure.

Even where a movant is entitled to fees and costs, they must be necessary and reasonable in order to be recoverable. *ACLI Gov't Sec., Inc. v. Rhoades*, 2000 U.S. Dist. LEXIS 1646, at *2 (S.D.N.Y. Feb. 18, 2000). Excessive, duplicative, or redundant bills are not recoverable. *See JLM Couture, Inc. v. Gutman*, 2022 U.S. Dist. LEXIS 232881, at *12-14 (S.D.N.Y. Dec. 21, 2022). Fees and costs that were not incurred on the contempt proceedings at issue are also not properly recoverable. *Ime Watchdog, Inc. v. Gelardi*, 2024 U.S. Dist. LEXIS 173763, at *19-21 (E.D.N.Y. Sept. 25, 2024). The burden to show reasonableness is on the movant. *Id.* at *9. A fee award may also be properly reduced to the extent the movant fails to prevail on relief sought. *Meehan v. Gristede's Supermarkets, Inc.*, 2004 U.S. Dist. LEXIS 31805, at *13-14 (E.D.N.Y. Aug. 4, 2004).

Here, Vertime's fee application facially includes several categories of work unrelated to this motion, requiring reduction. Perhaps most obviously, many of Vertime's billing entries include time spent on settlement discussions or other settlement-related matters. *See* Dkt. 198-1 at 47, 51, 57, 61-62, 87-88, 98, 101, 104, 107, 112, 114, and 118.[8] Time spent on settlement of this case is not time spent on investigating or prosecuting the contempt motion at bar.

---

[8] Several of these settlement-related entries cover six hours or more of attorney time. *See* Dkt. 198-1 at 87 (7.2 hours), 88 (6.7 hours), 98 (6.3 hours), and 101 (6.0 hours).

Vertime's billing entries also include time spent on other motions.  For instance, Vertime seeks reimbursement for work done in connection with Samuel Schiff's motion to quash subpoenas that Vertime served on him and his company Evergreen (*see* Dkt. 77), and Fischer-Stuhrling's pre-motion request to quash subpoenas addressed to it (*see* Dkt. 130).  Time entries regarding the former add up to over $10,000 in fees (Dkt. 198-1 at 46-47, 51); time entries regarding the latter exceed $3,000 (*id.* at 73, 77).  Many of the same entries also concern Vertime's work on a motion to compel discovery from Schiff and Evergreen (Dkt. 83).  *See* Dkt. 198-1 at 42, 47.  The Court ultimately denied Vertime's motion to compel (Dkt. 87) as well as the motion to quash (5/1/2018 Minute Entry).  There is no basis to compel NDG to pay Vertime's fees for this work.  Even granting that contempt fee awards may include time spent investigating the facts of contempt, time spent litigating other motions altogether is excessive—particularly since these motions involved Schiff/Evergreen, Fischer-Stuhrling, and their conduct, not NDG.

Nearly all of these instances are part of block billing entries that include other work.  Although block billing is not prohibited in the Second Circuit, the practice makes it "difficult to determine whether, and/or the extent to which, the work done by [Vertime's] attorneys is duplicative or unnecessary."  *Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc.*, 277 F.Supp.2d 323, 326 (S.D.N.Y. 2003).  This further favors reduction.

Vertime also improperly includes time spent as far back as 2017 on prior iterations of the present motion, which is Vertime's third version.  *See* Dkt. 112 (first motion), 160 (second motion).  The first motion was filed prematurely, before the factual picture was complete; accordingly, it was denied without prejudice, to allow further discovery.  *See* Dkt. 153.  It was grounded in a highly different record from the one at issue now.  Friedmann, Fischer, and Yiddy Werzberger's testimony from the March 5, 2019 hearing was not yet available, and key documents on which

both parties rely had not yet been produced, including (i) documentation of NDG's pre-Injunction delivery of the Products to Fischer-Stuhrling, and the invitation to the *sheva brachos* event at which Fischer and Friedmann effected the sale on June 11, 2017 (Dkt. 151), and (ii) QuickBooks "audit trails" for the key invoices between NDG and Fischer-Stuhrling, further proof of the *sheva brachos* event, and documentation of Mr. Friedmann's travel around June 2017 (Dkt. 152). In sum, Vertime's first motion for contempt was a significantly different motion on a significantly different record, and the costs of preparing it should not be awarded in connection with this motion.

Fees on Vertime's second motion for contempt lie at the other end of the spectrum: they are redundant and duplicative of fees on the present motion, because the substance was effectively the same. Comparison of the two memoranda of law demonstrates the point: between the second motion and the third, virtually no language was added or changed, other than a few added footnotes. *Compare* Dkt. 160 *with* Dkt. 183. Despite this, Vertime claims at least 3.7 hours, costing over $1,500, to update the motion papers in August 2022. That work is duplicative.

Alternatively, even if the Court finds that the inclusion of extraneous work on other topics, other motions, and previous contempt motions is not improper, in that case Vertime's fee submission would still be inappropriate—due to its sheer size. Vertime claims a total of 471.2 hours of attorney time. *See generally* Dkt. 198-1.[9] Far smaller amounts of time have been found excessive by courts in this Circuit. *See H&R Block Tax Servs., LLC v. Strauss*, 2015 U.S. Dist. LEXIS 87668, at *19 (N.D.N.Y. July 7, 2015) ("the number of hours billed—90.25 hours—are excessive for a straightforward contempt proceeding."); *City of Almaty v. Mukhtar Ablyazov*, 2025 U.S. Dist. LEXIS 258832, at *6-8 (S.D.N.Y. Dec. 15, 2025) (finding 176.1 hours on contempt motion to be excessive and applying a 75% reduction to fee request). Whether Vertime's fee

---

[9] Counsel relied on the summaries of each invoice in Dkt. 198-1 to reach this total.

request is viewed as improperly including multiple subjects, or viewed as the start-to-finish course of a single contempt application, it is unreasonably excessive either way.

Three other factors favor reduction of Vertime's requested fees. First, this motion is not especially complex. The law governing contempt is well-developed and clear, not esoteric or specialized in nature. The facts are straightforward as well, despite having taken time to develop. Although minute detail is available in places, such as the documentation of individual Products, information at that level of granularity has little relevance to the question of whether contempt was committed, and if so, what remedy is warranted. It is not necessary, for instance, to trace the movement of individual watches by serial number, or calculate their current value to the dollar. *Accord Gesualdi v. Bestech Transp., LLC*, 2022 U.S. Dist. LEXIS 52271, at *10 (E.D.N.Y. Mar. 23, 2022) ("[W]hile Plaintiffs' efforts in pursuing the Contempt Motion spanned several years and were likely tedious, such a matter is not complex in nature.").

Second, once again, it is a relevant consideration that NDG indisputably lacks the resources to pay a six-figure fee award. NDG's inability to pay weighs against awarding fees in the first instance. *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 658 (2d Cir. 2004). Alternatively, if fees are awarded, the inherent overkill of incurring hundreds of hours seeking contempt sanctions against a defunct company with no assets supports a steep reduction. *See City of Almaty*, 2025 U.S. Dist. LEXIS 258832, at *5-8 (finding that no reasonable, paying client would pay for 176.1 hours of attorney time prosecuting a contempt motion against a defendant who had been found unable to pay a judgment of $221,285.31). The fact that Vertime itself may have actually paid counsel's bills is not dispositive of their reasonableness.

Third, Vertime seeks $4,658.50 for attorneys' fees in connection with preparing its Statement of Damages. *See* Dkt. 1981-1 at 118-19. However, there is no requirement to award fees incurred in connection with preparing a fee application itself. *Comm'ns Imp. Exp. S.A. v. Republic of the Congo*, 2021 U.S. Dist. LEXIS 208639, at *17-18 (S.D.N.Y. Oct. 27, 2021). Here, the Court directed submissions on Vertime's alleged damages, without a finding that NDG had committed contempt: in other words, this additional work was not necessitated by bad faith on NDG's part, weighing against an award of "fees on fees." *See Williams v. City of New York*, 2017 U.S. Dist. LEXIS 70929, at *9 (S.D.N.Y. May 9, 2017).

## III.   Vertime's Request for Disgorgement is Improper

Vertime also asks the Court to compel disgorgement of "all of NDG's profits from the date of the Injunction[,]" specifically the $745,800 remitted from Fischer-Stuhrling following the sale of the Products and the Move. NDG has no assets, and the $745,800 was paid to First SBF Holding Inc. not NDG. Friedmann Dec. ¶ 9-11. Hence, disgorgement is impossible. Further, although disgorgement of net profits can be appropriate where contemptuous sales have taken place (*Sweater Bee*, 885 F.2d at 7), it is not appropriate here.

Besides NDG possessing no assets to disgorge, there are two other threshold defects with Vertime's request. First, it is contemptuous <u>sales</u> that can justify disgorgement of net profits. *Id.* (holding that Sweater Bee was entitled to profits "derived . . . from the unlawful sales"). Here, the sale of the Products took place before the Injunction was entered, on June 11, 2017, and therefore cannot have been contemptuous. *Uniformed Fire Officers Ass'n v. De Blasio*, 973 F.3d 41, 48 (2d Cir. 2020). Even if the Court were to find for the alternative argument that the <u>Move</u> was contemptuous, the physical transfer of the Products as distinct from their sale would not properly support disgorgement as a contempt remedy. Second, disgorgement would be particularly

unwarranted here if the Court grants one of the other forms of relief that Vertime requests: where compensatory sanctions have already been granted, adding disgorgement risks an improper double recovery. *See Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*, 2018 U.S. Dist. LEXIS 151961, at *54 (S.D.N.Y. Aug. 22, 2018).

Moreover, Vertime's suggestion that any sale made in violation of the Injunction "was a sale that Vertime was unable to make through its new distributor" (Dkt. 198 at 5) lacks any support. If the idea is that Vertime would have sold their own Ferragamo/Versus/Versace watches to Fischer-Stuhrling if NDG had not sold Fischer-Stuhrling the Products, there is no proof that Vertime had any connection with Fischer and could have made such a sale to him. *See* Hearing Tr. 175:4-23 (Fischer's testimony that he focuses on buying overstocked watches and selling them in *atypical* markets); 178:8-14 (testimony that "Versus, Ferragamo goods are not goods that I normally purchase . . . [T]his is not a deal that I normally would do."). Further, if the idea is that Vertime would have sold the same watches to Fischer-Stuhrling (or other buyers) if NDG had not done so, Vertime's theory ignores that Vertime would have had to repurchase the Products from NDG at significant cost first. *See* Dkt. 28 at 8 (seeking relief in terms of repurchasing the Products), Dkt. 29 at 14, 44, 70 (Section 12.4 in the Ferragamo, Versace, and Versus distribution agreements respectively, regarding Vertime's repurchase of Products). Either way, Vertime is wrong that it would have realized similar sales but for NDG's conduct.

Beyond these points, Vertime's argument for disgorgement also fails because NDG demonstrably has not earned any net profits to disgorge. NDG's sale of the Products to Fischer-Stuhrling valued them at $5,375,120.40. *See* Dkt. 193-1 at 173-298 (Hearing Exhibits F through H, showing invoice #191089096 for $3,362,050.55; #191092814 for $72,903.75; and #191093015 for $1,940,166.10); *see also* Hearing Tr. 158:1-3 (Fischer estimated the deal was worth

approximately $5 million).  NDG had paid Vertime millions to acquire the Products in the first place, before the parties' relationship ended in December 2016.  Friedmann Dec. ¶ 5.  The only revenue NDG or any of its affiliates has received from the Products is the $745,800 remitted by Fischer-Stuhrling to First SBF Holding Inc.  Thus, NDG has a net loss on the Products of millions of dollars, and has no net profits to disgorge.  *See* Hearing Tr. 123:20 (Mr. Friedmann's testimony that "I lost millions of dollars" on the transaction); Friedmann Dec. ¶ 5-11.

It is of no moment that NDG did not pay Vertime's final invoice before the parties' relationship ended on December 31, 2016.  NDG did this because of offsets Vertime owed NDG, *e.g.* NDG's spending of significant sums on advertising in reliance on Vertime's assurances that it would renew the parties' relationship, and because other companies affiliated with NDG such as AOB Holding Inc. made payments to Vertime on NDG's behalf that apparently have not been properly credited.  *Id.* ¶ 14.  Further, it is not feasible to undertake the multi-step analysis to determine which individual watches sold by Fischer-Stuhrling generated the $745,800 in revenue remitted by Fischer-Stuhrling, and whether those watches relate to Vertime's final invoice.  There are approximately 50,000 watches at issue, and the exercise would require line-by-line comparison of Fischer-Stuhrling's sales records against NDG's records of inventory for which it did or did not pay Vertime.  For counsel to attempt this would be cost-prohibitive and outside their expertise; and no resources exist to hire a consultant, vendor, or expert witness for the purpose.  And, even if such an exercise were feasible, it would not affect the bottom line: despite Fischer-Stuhrling's remittance of $745,800 to First SBF Holding Inc., not NDG, the Products are a net loss of millions of dollars.  NDG has no profits from the Products to be disgorged, even from any watches covered by Vertime's final invoice.

Finally, NDG's uncontroverted lack of assets is once again a key consideration. NDG does not possess the $745,800 in funds that First SBF Holding received from Fischer-Stuhrling in 2017 and 2018: those assets have long since been disposed of to pay creditors. Friedmann Dec. ¶ 10. Even if Mr. Friedmann's testimony on this point were rejected, the bankruptcy speaks for itself: if NDG possessed the $745,800, the trustee would have identified and administered it, and he did not. It is unwarranted to order NDG to disgorge assets it no longer possesses. *See Gucci Am., Inc. v. Lord & Taylor Ecomm LLC*, 2025 U.S. Dist. LEXIS 205259, at *10 (S.D.N.Y. Oct. 17, 2025) ("Plaintiff has not shown that the goods are still in Defendant's possession and that Defendant is able to disgorge them as ordered.").

## IV.    Vertime Has Not Justified An Award of Sanctions Based on the Court's Inherent Authority

Finally, Vertime requests sanctions against NDG for "false and misleading statements[,]" specifically an award of attorneys' fees plus unspecified "damages for the harm caused by NDG's continued sales[,]" based on the Court's inherent authority. Dkt. 198 at 10-12. This request is meritless.

Sanctions under the Court's inherent power require a highly demanding showing that Vertime cannot make. They "are warranted only where there is clear and convincing evidence of bad faith[,]" and are "reserved for extreme cases of bad faith or fraud on the court." *Mazzei v. Money Store*, 2023 U.S. App. LEXIS 27213, at *9-10 (2d Cir. Oct. 13, 2023); *see also N.Y. Wheel Owner LLC v. Mammoet*, 2021 U.S. Dist. LEXIS 121098, at *10-11 (S.D.N.Y. June 29, 2021) (holding that, even assuming a party had asserted diversity jurisdiction without a colorable basis, the movants had not proved by clear and convincing evidence that said party did so in deliberate bad faith). As discussed above, Vertime has failed to satisfy much less demanding burdens; therefore, Vertime necessarily fails this stricter standard. Vertime relates a laundry list of

complaints, but does not prove that any particular act by NDG was completely lacking a colorable legal basis and done in deliberate bad faith.  Even if NDG's sale or Move of the watches were deemed contemptuous, NDG has explained that it (understandably) believed itself to be acting within the letter of the Court's orders, and intended no disrespect to the Court.  Dkt. 189 at ¶ 15.

Vertime's request for inherent-authority sanctions fails due to inability to prove the required high level of bad faith, without more.  However, it bears noting that Vertime's argument on this point flagrantly distorts the record.  At best, Vertime treats its own partisan view as undisputed and irrefutable; at worst, it strays into outright misrepresentation.  For instance, Vertime repeatedly states as if it were undisputed fact that NDG conducted a continuing pattern of post-Injunction sales.  *See* Dkt. 198 at 10-12 ("the harm sought to be prevented by the Injunction <u>continued to occur</u> due to NDG's contempt…"; "Vertime was forced to depose third-parties . . . to learn the truth about NDG's <u>continued sales</u> via Fischer-Stuhrling"; seeking "damages for the harm caused by NDG's <u>continued sales</u>.") (emphasis added).  In reality, NDG categorically disputes this false allegation, which Vertime has fallen utterly short of proving.  Similarly, Vertime claims that "NDG did not, and still has not, taken any steps to correct its false and misleading statements."  Dkt. 198 at 10.  This entire paragraph is copied and pasted verbatim from Vertime's August 2022 moving brief on the merits of contempt.  Consequently, it ignores the fact that Mr. Friedmann submitted an affidavit in opposition to the moving brief, explicitly to correct and clarify his prior testimony. *See* Dkt. 189.

Vertime is not entitled to attorneys' fees, nor open-ended and undefined "damages[,]" based on the Court's inherent authority.  Even if NDG is found to have committed contempt, NDG has never acted without a colorable legal basis and good-faith intent.

## **CONCLUSION**

For all the foregoing reasons, as well as those stated in the Declaration of Samuel Friedmann submitted herewith, NDG respectfully requests that the Court deny the Motion with prejudice, together with such other and further relief as the Court may deem appropriate; and that in the alternative, if the Court should grant the Motion to the extent of finding NDG in civil contempt, the Court should deny each and every form of relief requested in Vertime's Statement of Damages.


Dated:  December 22, 2025
       New York, New York

                                       **REED SMITH LLP**

                                       /s/ Louis M. Solomon
                                          Louis M. Solomon
                                       599 Lexington Avenue, 22nd Floor
                                       New York, New York 10022
                                       Tel:  212-521-5400
                                       Fax:  212-521-5450
                                       Email: lsolomon@reedsmith.com

                                       *Counsel for Defendant New Dover Group,*
                                       *Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing has been electronically filed on December 22, 2025.  Notice of this filing will be sent to the parties of record by way of the Court's electronic filing system.

Dated: December 22, 2025                    Respectfully submitted,
      New York, New York

                                      /s/ *Lou Solomon*
                                      Louis M. Solomon
                                      Reed Smith LLP
                                      599 Lexington Ave
                                      New York, NY 10022
                                      Tel: (212) 521-5400
                                      lsolomon@reedsmith.com

                                      *Counsel for New Dover Group, Ltd.*

## <u>WORD COUNT CERTIFICATION</u>

Pursuant to Rule II.B of this Court's Individual Rules of Practice, the undersigned hereby certifies that this Memorandum of Law consists of 8,542 words, excluding the caption, table of contents, table of authorities, signature blocks, and certifications, and complies with the Court's word-count limitations. The undersigned relied on the word-processing program used to prepare the memorandum of law in order to assess the word count.

Dated: December 22, 2025
      New York, New York

                                   /s/ *Lou Solomon*_____
                                   Louis M. Solomon